Filed 2/27/15  P. v. Lopez CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059963 |
| v. | (Super.Ct.No. RIF1300897) |
| ANTONIO LUIS LOPEZ, | **OPINION** |
| Defendant and Appellant. | |


APPEAL from the Superior Court of Riverside County.  Charles J. Koosed, Judge.

Affirmed in part; reversed in part with directions.

Melanie K. Dorian, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney

General, Eric Swenson, and Barry Carlton, Deputy Attorneys General, for Plaintiff and

Respondent.

1

Defendant Antonio Luis Lopez arrived at his wife's house, with whom he was not living with at the time, and threatened her, and her three children who lived with her, that he was going to shoot them with a gun. His wife and children locked themselves in the bedroom. Defendant forced his way into the bedroom and assured them that he in fact did not have a gun. Defendant retreated to the kitchen where he armed himself with a knife. He returned to the bedroom with the knife. He held the knife to his wife and told them that he was not going to leave any witnesses.

Defendant was convicted of a total of eight counts of making terrorist threats, one count of assault with a deadly weapon, and two counts of felony child endangerment. Defendant now claims on appeal as follows:

1.      Defendant's convictions for felony child endangerment pursuant to Penal Code section 273a, subdivision (a)[1] must be reversed or reduced to misdemeanor violations because the trial court omitted an element of the crime from the pattern instruction.

2.      He could not be found guilty of multiple counts of making criminal threats pursuant to section 422 against each victim because the crimes were all part of a continuous crime.

3.      Section 654 precludes multiple punishment on several of his convictions.

---

[1]      All further statutory references are to the Penal Code unless otherwise indicated.

2

We agree that defendant's felony child endangerment convictions should be reversed. We remand for retrial, or resentencing if the People elect to reduce the charges to misdemeanor child endangerment convictions. We otherwise affirm the judgment.

I

PROCEDURAL BACKGROUND

Defendant was found guilty by a Riverside County Superior Court jury of eight counts of making criminal threats within the meaning of section 422 as follows: Jane Doe 1, his wife (C.R.) (counts 2, 7);[2] Jane Doe 2 (D.N.) (counts 3, 8); Jane Doe 3 (R.N.) (counts 4, 9); and John Doe (O.S.) (counts 5, 10).[3] It was further found true by the jury as to counts 7 through 10 that defendant personally used a dangerous or deadly weapon, a knife, within the meaning of sections 12022, subdivision (b)(1) and 1192.7, subdivision (c)(23). Defendant was also found guilty of assault with a deadly weapon, a knife, within the meaning of section 245, subdivision (a)(1) against C (count 6); and two counts of felony child endangerment within the meaning of section 273a, subdivision (a), against D (count 11) and R (count 12).

Defendant was sentenced to four years on count 11, plus one year, four months on count 12. In addition, defendant was sentenced to consecutive sentences of eight months on count 10, plus four months for the use of a knife enhancement; eight months on counts

---

[2]     Count 1 in the information was a charge of burglary (§ 459) that the jury was unable to reach a verdict and a mistrial was declared by the trial court. The People dismissed the charge in the interests of justice.

[3]     In the amended information, Jane Doe 2 was listed as "D.V." and Jane Doe 3 was listed as "R.V." However their initials were later corrected to D.N. for D.V. and R.N. for R.V.

2 and 5; and one year on count 6.  The trial court stayed the sentences on counts 3, 4, 7, 8 and 9.  He received a total prison sentence of eight years and eight months.

II

FACTUAL BACKGROUND

A. *People's Case-in-Chief*

1. *The incident*

On December 19, 2012, shortly before midnight, Riverside County Sheriff's Deputy Manuel Bustillos was dispatched to a house in Perris.  Once he arrived, he spoke with defendant and C.  C advised Deputy Bustillos that she and defendant had had a verbal argument.  Deputy Bustillos observed that defendant was under the influence of alcohol.  Initially, the parties agreed that defendant would calm down and just sleep on the couch.  However, prior to Deputy Bustillos leaving the location, C came to his vehicle and expressed concern that defendant was continuing to drink, and being loud and obnoxious.  Deputy Bustillos gave defendant a ride to his parent's house which was only about eight miles away from C's house.

About one hour later, on December 20, Deputy Bustillos was again dispatched to the Perris house.  Deputy Bustillos observed a vehicle parked in the driveway that had not been at the location during the prior time that he responded.

Defendant was again at the house and was arrested.  O, D and R were all in the house with C and appeared scared when he arrived.  R told Deputy Bustillos that when defendant returned to the house, he went around the house screaming.  C, O, D and R all went into the bedroom and locked the door.  Defendant told them he had a gun and

4

enough ammunition to kill them all. Defendant broke down the door. He went into the kitchen and grabbed a knife. He returned to the room and made several statements about killing C and stabbing the children. R told Deputy Bustillos that he threatened to cut C's throat. Defendant also said that he was not going to leave any witnesses. R showed Deputy Bustillos the knife defendant had been holding which was on the bed.

Deputy Bustillos also spoke with D. She told him that defendant had returned to the residence and that he was being loud and obnoxious. D also stated that she, C, O and R had all locked themselves in the bedroom. Defendant broke the door down, and then went to the kitchen to get a knife. He came back with the knife and threatened to kill them with the knife.

Deputy Bustillos also spoke with O. He told the deputy that defendant walked around the house yelling that he had a gun and that he had enough ammunition to kill them all. Defendant said he had nine rounds of ammunition. C, O, D and R all locked themselves in the bedroom but defendant broke down the door. Defendant went to the kitchen and got a knife. He returned to the bedroom and held it to C's face. He was demonstrating how he was going to cut her throat with a knife. Defendant said that he would kill everyone so that there were no witnesses.

Deputy Bustillos also spoke with C. She said that when defendant came to the house the second time, he was angry and appeared more intoxicated. She also recounted that defendant claimed to have a gun and enough ammunition to kill them all. C told Deputy Bustillos that she was terrified. Defendant broke the bedroom door and went into

5

the kitchen where C heard him going through the utensil drawer. Defendant returned to the room with a knife in his hand.

C was sitting on the ground of the bedroom. Defendant held the knife to her face and told her that he was going to kill her with the knife. She was scared. No gun was located in the house. The locking mechanism on the bedroom door was broken.

### 2. *Trial testimony of the victims*

C married defendant on May 5, 2012. However, they had never lived together because they immediately began having problems. C recalled that on December 19, 2012, she had to call the police because defendant was intoxicated. Defendant was not arrested and was taken to his mother's home.

Defendant returned to the Perris house. When he first arrived, C heard a car burning rubber outside the house. C recalled defendant said something about a gun but she did not recall that he had threatened her. C feared for her own and her children's lives because defendant was intoxicated.

Defendant entered the bedroom and was yelling. C dialed 911.[4] C advised the operator that she had called earlier about defendant being drunk at her house and that he had now returned to the house. Defendant could be heard yelling in the background. At one point he yelled, "Fuckin' die. I WANNA DIE." C told the operator that defendant was coming in the room and then C yelled at defendant to stop. Defendant could be

---

[4]     The 911 call was played for the jury.

6

heard to say, "I got a loaded gun . . ." C again asked him to stop. Defendant told C he was not happy that she was talking to the police and that she should hang up.

C told defendant to get out of the room and to stay away. C then told the operator that defendant was getting a knife. She told defendant to put the knife away. C and defendant talked and she continued to ask him to leave the bedroom. C then told defendant to stop hitting himself.

C agreed at trial that she sounded scared in the call. C recalled that defendant mentioned a knife but she denied that she ever saw him with one. C told the police the truth that night but could not remember what she said. C admitted that she and defendant were currently working on their marriage.

O was 19 years old by the time of trial and was home that night. O said that things got out of control with defendant that night because he had been drinking.

O, his sisters and C were all locked in the sisters' bedroom because defendant had threatened them with a gun. C called the police. O did not recall defendant saying that he had a loaded gun and that it was going to be a "bloody massacre." O admitted he was afraid for his life if defendant came through the bedroom door with a gun. Defendant forced his way into the room by pushing the door open and breaking it. He lifted up his coat and showed them that he did not have a gun. Defendant then left the room. O heard defendant looking for something in the kitchen. Defendant returned to the room.

Defendant was yelling at all of them. O did not recall at trial what defendant said or if he was holding the knife when he returned to the room. O did not believe that defendant was capable of killing C because defendant loved her.

7

D was 16 years old at the time of trial. On that day, she observed that defendant had been drinking and that he was exhibiting unusual behavior. Defendant threatened all of them in the house that he had a gun and that he was going to kill everyone in the house.[5] Defendant broke down the door to get into the bedroom. D also recalled that defendant went into the kitchen and she could hear noises in the kitchen. Defendant returned to the bedroom and had a knife. He pointed the knife at all of them (her, C, R and O) to scare them. At one point, defendant pointed the knife near C and threatened to cut her throat. Defendant threatened that he was not going to leave any witnesses. D was afraid she was going to die.

R was 15 years old at the time of trial. On that night, defendant appeared to be drunk. She heard defendant burning the rubber on his tires in front of the house. R, D, O and C all hid in her bedroom and locked the door.

Defendant threatened them that he had a gun. R took this as a threat to her life. Defendant pushed the door open and broke it. R heard defendant in the kitchen going through the drawers. R believed that defendant came back to the room holding a knife. He continued to yell at them. R was scared. Defendant threatened to cut C's throat with a knife. He held the knife against her throat.

B.    *Defense*

Defendant testified on his own behalf. Defendant met C in 2007 at church. Defendant started living with C after they were married in May 2012 and lived with her

---

[5]    She later testified she did not recall him saying he had a gun.

8

full time. Defendant started drinking on December 19, 2012, because he came home and found R and D alone with two boys. He drank two 40-ounce beers that night. When C got home, defendant and C argued about the boys being in the home.

Defendant claimed he used a knife from the kitchen to pry open the bedroom door because C was inside the room and he wanted to talk to her. Defendant denied that he ever threatened to kill C or any of the children with a knife or gun. Defendant stated that C, O, D and R could be liars. He drove himself from his parent's house back to the Perris house.

Defendant's interview with the police on December 20, which was conducted at approximately 3:00 a.m., was played for the jury. Defendant claimed his brother dropped him off at the Perris house the second time. He insisted that C told the children what to say to the police. Defendant denied that the bedroom door had been broken by him. He claimed they all lied because they wanted him out of the house.

## III

## INSTRUCTIONAL ERROR

Defendant contends that his convictions in counts 11 and 12 for felony child endangerment against R and D must be reversed, or reduced to misdemeanors, because the trial court erroneously eliminated one of the elements of the crime in the pattern instruction CALCRIM No. 821. The People have agreed that the felony child endangerment charges must be reversed and the case must be remanded for retrial on these counts or, at the election of the prosecution, reduced to misdemeanors.

9

A. *Additional Factual Background*

During discussion of the instructions, the trial court noted, "821 as modified will be given." There was no discussion on the record as to the modification. Further, the trial court noted that no lesser offense instructions were being requested or given.

The jury was instructed in total on these charges as follows: "The defendant is charged in Counts 11 and 12 with child abuse in violation of Penal Code section 273(a), subdivision (a). To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant willfully inflicted unjustifiable physical pain and suffering on a child. Someone commits an act willfully when he or she does it willingly or on purpose. A child is any person under the age of 18 years. Unjustifiable physical pain or mental suffering is pain and suffering that is not reasonably necessary or is excessive under the circumstances."

During argument, the prosecutor argued as to the child endangerment, "[Y]ou got to hear them [R and D] describe what went on in that room and how he forced himself in. But no child should ever have to go through that, that unjustifiable mental suffering. Not just their own fear, right, their lives may be taken, but first he's going to make me watch -- make me watch as he kills my mom. And they believe it. They believe it. It becomes abundantly clear to Deputy Bustillos that night they believe it, and you have him here in court and their actions here in court tell you they believed it. Were you scared? We are scared for our lives."

Defendant's counsel responded that the evidence did not establish that C and the children were scared about the threat regarding the gun and the knife, but rather, just that

10

he was drunk.  Defendant's counsel made no further argument regarding the child endangerment.

At sentencing, the prosecutor stated, "Counts 11 and 12, the child endangerment charges, the facts that give rise to that endangerment are contained in the 422 counts pertaining to the minor children.  And I think they are 4 and 5.  I don't have the Information in front of me.  I may be getting this wrong.  There's a count that both - - two minor children have 422s based on the gun statement.  They have a 422 based on the knife statement.  Those - - that is what gives rise to the 273a(a), so I think that those are all 654 with the 273a(a) being primary term as it carries the most time."

B.      *Analysis*

Section 273a, subdivision (a), states that "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years."

A violation of section 273a "'can occur in a wide variety of situations:  the definition broadly includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect.' [Citation.]  We have also observed, however, that '[t]wo threshold considerations . . . govern all types of conduct prohibited by this law:  first, the conduct must be willful; second, it must be committed "under

11

circumstances or conditions likely to produce great bodily harm or death." [Citation.] Absent either of these elements, there can be no violation of the statute.' [Citation.] . . . '[T]here is no requirement that the actual result be great bodily injury.' [Citation.]" (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215-1216.)

"'"[L]ikely' as used in section 273a means a substantial danger, i.e., a serious and well-founded risk, of great bodily harm or death . . . . [I]n the context of child endangerment this definition of the term 'likely' draws a fair balance between the broad protection the Legislature intended for vulnerable children and the level of seriousness required for a felony conviction." (*People v. Wilson* (2006) 138 Cal.App.4th 1197, 1204.)

"It is for the trier of fact to determine whether the act was done 'under circumstances or conditions likely to produce great bodily harm or death,' i.e., under conditions 'in which the probability of serious injury is great.' [Citations.] If so, the crime is punishable as a felony; if not, solely as a misdemeanor." (*Sargent, supra,* 19 Cal.4th at p. 1223.)[6]

Here, it is undisputed that the trial court eliminated the element of section 273a, subdivision (a) that the trier of fact must determine that the child abuse was committed under conditions and circumstances likely to produce great bodily injury or death. The error constitutes erroneous instruction on an element of the crime and requires reversal unless we are able to say it was harmless beyond a reasonable doubt.

---

**6**     Subdivision (b) of section 273a is nearly identical to subdivision (a) but does not require conditions likely to produce great bodily harm or death.

In *Neder v. United States* (1999) 527 U.S. 1, 18-21, the United States Supreme Court held that a jury instruction that erroneously omits elements of the offense is subject to a harmless error analysis. The harmless error standard is governed in such a case by *Chapman v. California* (1967) 386 U.S. 18, 36. "[I]n analyzing whether an error was harmless, . . . [we] '"conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error — for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding — it should not find the error harmless." [Citation.] On the other hand, instructional error is harmless "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence." [Citations.]' [Citation.] Our task, then, 'is to determine "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." [Citations.]'" (*People v. Mil* (2012) 53 Cal.4th 400, 417.)

Having conducted a thorough examination of the record, we cannot say that omitting the element of conditions or circumstances likely to produce great bodily injury from the instruction was harmless beyond a reasonable doubt. Although the evidence of circumstances and conditions likely to produce great bodily injury or death are sufficient to support a conviction for felony child endangerment in this case, the evidence is not overwhelming. Here, defendant did not have a gun in his possession and made it clear to C and the children he did not have a gun. Further, as to the knife, defendant held the knife to C, but there was no evidence he ever approached O, R and D with the knife.

Defendant contested at trial that he ever had a knife in his possession. It is conceivable that the jury, had they been properly instructed, could conclude that with the absence of the gun, and the knife being held to only C, that R and D were not put in a situation that would likely cause great bodily injury. Further, no other instructions asked the jury to find that defendant's actions against R and D were likely to produce great bodily injury or death. The jury was instructed as to section 422 that defendant had to threaten to commit great bodily injury, not that he acted under circumstances likely to produce great bodily injury.

The evidence and inferences that may reasonably be drawn from the evidence discussed above do not prove for purposes of the harmless error analysis that defendant committed felony child endangerment so overwhelmingly that the jury could not have had a reasonable doubt on the matter. Consequently, we cannot conclude that the omitted element of felony child endangerment resulted in an error that was harmless beyond a reasonable doubt.

Defendant asks this court to either reverse the convictions or to reduce the charges to misdemeanors. Respondent argues that the district attorney should have the option of reducing the charges to violations of section 273a, subdivision (b), or retrying these counts. We have not found that the evidence was insufficient to support the convictions of felony child endangerment. As such, we agree with respondent and will remand to the trial court for possible retrial of the charges at the election of the district attorney. The People can also choose to reduce the charges to misdemeanor convictions of section 273a, subdivision (b), and defendant will be resentenced.

14

IV

## MULTIPLE CONVICTIONS OF MAKING TERRORIST THREATS

Defendant contends that he could not be convicted of two counts of making terrorist threats pursuant to section 422 against each victim because the facts of this case supported that there was only one continuous crime of making terrorist threats.

"As relevant here, section 954 provides: 'An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged . . . .'" (*People v. Gonzalez* (2014) 60 Cal.4th 533, 536-537.) "Section 954 thus concerns the propriety of multiple convictions, not multiple punishments, which are governed by section 654." (*Id*. at p. 537.) In assessing whether multiple convictions are appropriate under section 954, the California Supreme Court has applied an approach that the determining factor is whether the crime was complete and a new and separate violation had occurred. (*People v. Harrison* (1989) 48 Cal.3d 321, 329, 334.) *Harrison* involved a statute that clearly defined single instances of a sexual offense. (*Ibid.*) Recently, in *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1518, that court applied the reasoning in *Harrison* to the crime of attempted dissuasion of a witness. It held that "a defendant may be convicted of multiple

15

crimes — even if the crimes are part of the same impulse, intention or plan — as long as each conviction reflects a completed criminal act."[7]

"In order to prove a violation of [Penal Code] section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat — which may be 'made verbally, in writing, or by means of an electronic communication device'— was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

In *People v. Salvato* (1991) 234 Cal.App.3d 872, 882 (*Salvato*), a case involving the failure to instruct with a unanimity instruction, the court held that violation of section

---

**7**      Defendant also cites to *People v. Bailey* (1961) 55 Cal.2d 514, 519. Numerous appellate courts had interpreted that case as setting forth a test that multiple convictions were proper if they were not based on crimes committed according to one intention, general impulse or one plan. The California Supreme Court recently stated in *People v. Whitmer* (2014) 59 Cal.4th 733, 740-741, that appellate courts had interpreted *Bailey* too broadly and found that multiple convictions based on separate and distinct acts were permitted even if part of a single overarching scheme.

422 "focuses on an individual act — a threat — although an effect (fear) is also required. The criminal act is denoted by a verb — 'threaten' — which ordinarily refers to an act taken at a particular moment in time rather than as a continuous course. The outcome, instilling of fear in the victim, does not come within the statute unless it is produced by a specific means, the 'unequivocal, unconditional, immediate, and specific' threat. Thus section 422 does not come within the continuous course of conduct exception." (*Id.* at p. 883.)[8] "[T]he term 'sustained fear' is defined . . . as a period of time 'that extends beyond what is momentary, fleeting, or transitory.'" (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1140.)

Here, the People charged two separate incidents of making terrorist threats. Nothing in the language of section 422 forecloses charging multiple counts. The making of terrorist threats by definition is not a continuous course of conduct. If the People, and as noted, *post,* they can, prove separate acts of making terrorist threats, nothing in the language of section 422 precludes the People from charging multiple counts.

This case is similar to *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1532 (*Melhado*). In *Melhado*, the defendant took his car into a repair shop but failed to pay for the repairs. The manager refused to return the car until the defendant paid. (*Ibid.*) After two weeks had passed and the defendant had failed to pay for the repairs in full, the

---

**8**    In *Salvato,* the defendant threatened the victim approximately 16 times between January and March 1988 and between February and March 1989. (*Id.* at pp. 876-877.) Hence, the acts in *Salvato* clearly were not part of a continuous course of conduct.

17

manager sent the defendant's car to storage.  (*Id.* at pp. 1532-1533.)  On the following day at about 9:00 a.m., the defendant came by the shop and was told his car had been sent to storage.  (*Id.* at p. 1533.)  The defendant became upset and told the manager "'I'm going to blow you away if you don't bring my car back.  I'm going home and I'm going to bring a grenade.'"  (*Ibid.*)  The defendant left the shop and the manager called the police.  (*Ibid.*)

About 11:00 a.m. that same morning, the defendant returned to the shop, pulled out a grenade from his jacket pocket, and threatened "'I'm going to blow you away'" and "'I'm going to blow up this place.'"  (*Melhado, supra,* 60 Cal.App.4th at p. 1533.)  The defendant was arrested later that day, charged with a single count of a criminal threat, and convicted.  (*Id.* at pp. 1532-1533.)

The defendant appealed on the ground the prosecution did not communicate to the jury its election as to whether it was relying on the 9:00 a.m. threat or the 11:00 a.m. threat and the trial court did not instruct the jury that they had to unanimously agree on one or the other in order to convict.  (*Id.* at pp. 1534-1535.)  The appellate court reversed the conviction, holding "the evidence presented in this case established that appellant committed two acts of making terrorist threats, each of which could have been charged as a separate offense, yet the matter went to the jury on only one such offense.  Because the prosecution's election was never clearly communicated to the jury, the trial court should have instructed on unanimity."  (*Id.* at p. 1539, fn. omitted.)

Although the period of time involved in this case was not as long as in *Melhado*, like *Melhado*, the evidence established that defendant committed two distinct acts of

18

making terrorist threats against all four victims. Here, the evidence shows that defendant arrived at the home and was loud and obnoxious. The children and C all locked themselves in the bedroom. Defendant threatened them that he had a gun and would shoot them all. All of them reasonably sustained fear when advised that defendant had a gun and was going to shoot them all. Defendant then broke into the bedroom. He lifted up his coat and advised them that he did not have a gun. No gun was ever found in the house. Upon showing his victims that he did not have a gun, the threat to shoot them no longer existed. C, O, R and D naturally would relax somewhat knowing they were no longer going to be shot. The threat had dissipated and the crime of making a terrorist threat was complete.

Thereafter, defendant left the room and went to the kitchen. Once he armed himself with the knife, he entered the room and made a new threat that he was going to stab them all. These were two distinct crimes of making terrorist threats. Defendant was properly convicted of all eight counts of violating section 422.

V

SECTION 654

Defendant contends that the trial court should have stayed the sentence on counts 2 and 5. The victim in Count 2 was C and involved the terrorist threat under section 422

19

that defendant was going to shoot them all with a gun. Count 5 involved the terrorist threat under section 422 against O made by defendant regarding the gun.[9]

A.    *Additional Factual Background*

The People filed a sentencing memorandum. They argued that counts 12, 11, 10, 6, 5 and 2 should all be sentenced consecutively. The remaining sentences should be ordered stayed pursuant to section 654. The People argued as to the two counts against O, "it can not [sic] be said that each threat was so closely in time and place as to indicate a single period of aberrant behavior." The People also stated that counts 2 and 6, both charged against C, should run consecutive.

At sentencing, defendant's counsel stated, in referring to the sentence memorandum filed by the People, "I am more closely in line with his analysis as to what is 654 than that proposed in the probation officer's statement."[10] According to the probation report, it was only recommended that counts 8 and 9 be stayed. Defendant agreed with the People's statement that counts 3, 4, 7, 8 and 9 were subject to section 654 stay.

The court fixed the principal term as to count 11 and imposed four years. It imposed a consecutive 16 month term on count 12. The trial court explained that it was

---

[9]    Although the case is being remanded for possible retrial on counts 11 and 12, and defendant will be resentenced, whether counts 2 and 5 should be stayed will necessarily have to be decided by the trial court.

[10]    Despite defendant's failure to object to the sentence imposed, he has not waived the issue on appeal. (See *People v Le* (2006) 136 Cal.App.4th 925, 931.)

running counts 2, 5, 6, 10, 11 and 12 all consecutive; the remaining sentences were stayed.

B. *Analysis*

Section 654, subdivision (a), provides as follows: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

Section 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct. Under California law, it is the defendant's intent and objective that determines whether the course of conduct is indivisible. Thus, if """"all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once."' [Citations.]" (*People v. Le, supra,* 136 Cal.App.4th at p. 931.)

"[S]ection 654 does not apply when the evidence discloses that a defendant entertained multiple criminal objectives independent of each other. In that case, 'the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'" (*In re Jose P.* (2003) 106 Cal.App.4th 458, 469.) Where the offenses are "separated by periods of time during which reflection was possible," section 654 does not prohibit multiple punishment. (*People v. Trotter* (1992) 7

21

Cal.App.4th 363, 368 (*Trotter*).)

"The question of whether the acts of which [a] defendant has been convicted constitute an indivisible course of conduct is primarily a factual determination, made by the trial court on the basis of its findings concerning the defendant's intent and objective in committing the acts." (*People v. Nichols* (1994) 29 Cal.App.4th 1651, 1657.) We review the trial court's findings "'in a light most favorable to the respondent and presume in support of the order the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Green* (1996) 50 Cal.App.4th 1076, 1085.) We uphold the trial court's findings when supported by substantial evidence. (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1252-1253.) Where the trial court does not make an express finding, an implied finding that the crimes were divisible must be upheld if supported by the evidence. (*People v. Nelson* (1989) 211 Cal.App.3d 634, 638.)

In *People v. Trotter, supra,* 7 Cal.App.4th 363, the defendant was convicted of three counts of assault for firing three shots at a police officer. The first two shots were about a minute apart, and the third shot came a few moments later. (*Id.* at p. 366.) The defendant argued that all three shots "manifested the same intent and criminal objective" and therefore could not be punished separately under section 654. (*Trotter,* at p. 367.) The court rejected the argument, stating, "this was not a case where only one volitional act gave rise to multiple offenses. Each shot required a separate trigger pull. All three assaults were volitional and calculated, and were separated by periods of time during which reflection was possible. None was spontaneous or uncontrollable. '[D]efendant should . . . not be rewarded where, instead of taking advantage of an opportunity to walk

22

away from the victim, he voluntarily resumed his . . . assaultive behavior.' [Citation.]" (*Id.* at p. 368.)

Here, defendant was punished for both the assault with a deadly weapon against C and the terrorist threat committed when he threatened to kill her (and the children) with a gun. Defendant was also punished for the two terrorist threats made against O.[11] These two acts were "volitional and calculated, and were separated by periods of time during which reflection was possible." (*Trotter, supra,* 7 Cal.App.4th at p. 368.) Defendant threatened C and the others that he had a gun and was going to shoot them all. Thereafter, he broke into the bedroom and showed them that he did not have a gun. Defendant retreated from the room. At this point, defendant had time to reflect on his actions. He could have chosen to leave the home at that point and no longer threaten his wife and children. However, he made a choice to return again to the bedroom and threaten all of them with a knife that he had found in the kitchen. Defendant had given O, C, R and D a false sense of security by showing that he did not have a gun and by leaving the room. However, he returned and terrorized them with a knife. He increased the threat to C by holding a knife to her throat. Defendant committed two distinct, volitional acts for which he was appropriately subject to punishment on both. The trial court did not abuse its discretion by sentencing defendant to consecutive sentences on counts 2 and 5.

---

[11] The two terrorist threats against R and D were stayed because counts 11 and 12 involved the underlying acts of both terrorist threats against them.

23

## VI

## DISPOSITION

We reverse defendant's convictions for felony child endangerment in counts 11 and 12. We remand for retrial or reduction to misdemeanor charges as elected by the People. We otherwise affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

HOLLENHORST
J.