[No. G011115. Fourth Dist., Div. Three. June 11, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD KEITH TROTTER, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976(b), parts IV, V, VI, and VII, are not published as they do not meet the standards for publication.

## COUNSEL

Stephen Gilbert, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, William M. Wood, Rhonda L. Cartwright and Maxine P. Cutler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MOORE, J.—Ronald Keith Trotter (defendant) was convicted of unlawfully taking a vehicle, evading a police officer with willful and wanton disregard for the safety of others, and three counts of assault on a peace officer with a firearm. The jury also found he personally used a firearm in the commission of the offenses. He was sentenced to an aggregate term of thirteen years, four months in prison, consisting of a midterm sentence of six years for the first assault, a consecutive two-year sentence for the second assault, four years for the use of a firearm in the first assault, and a consecutive term of one year, four months for using a firearm in the second assault. Sentence on all remaining counts and enhancements was stayed.

In the published portion of the opinion, we consider defendant's contentions that the jury found he was armed with a firearm, not that he used a firearm, and that the trial court erred in imposing consecutive sentences for two of the assaults.

## I. FACTS

On the morning of July 6, 1990, defendant entered a taxi cab driven by Valeri Yakubov at the John Wayne Orange County Airport. Defendant, who is Black, wore light makeup on his face and his hair was painted white. He wore dark glasses, a heavy black leather jacket and gloves, and carried a briefcase. Yakubov noticed defendant continually placed his hand near his

waistband and saw him reach for a gun. He jumped into the backseat while the taxi was still moving and struggled with defendant for possession of the gun. The two fell out of the taxi and continued to struggle. Defendant regained control of the weapon and fired it, striking the pavement. A passing motorist called 911 after she saw defendant climb back into the taxi while holding the gun and then leave the scene.

Irvine Police Officer John Bledsoe saw defendant on the 405 freeway driving the taxi and followed him onto the Interstate 5 freeway. Defendant drove recklessly and twice pointed his weapon in Bledsoe's direction. After Bledsoe turned on his overhead lights, defendant fired a shot at Bledsoe's vehicle which fragmented the back window of the taxi. Approximately a minute later, defendant fired another shot at Bledsoe's vehicle which blew out a portion of the taxi's rear window. Seconds later, a third shot obliterated the entire window. Bledsoe's vehicle was from 30 to 50 yards behind the taxi, with no vehicles in between, when the shots were fired.

Defendant left the freeway and drove through Laguna Niguel, stopping when the taxi hit a center divider, causing two flat tires. He ran down an embankment into a secluded, wooded area where he was shot by a pursuing officer.

Defendant testified at trial he did not intend to shoot Bledsoe, but attempted to shoot the radiator of Bledsoe's car in order to disable it. He did so because he feared the police would kill him.

## II. CONSECUTIVE SENTENCES FOR TWO OF THE ASSAULTS

██ Defendant contends he should not have been sentenced consecutively in two of the three assaults, arguing they were "part and parcel" of a single course of conduct and were incidental to one objective. He asserts since he fired at Bledsoe to avoid apprehension, and since the second shot was within one minute of the first, he cannot be punished for both under Penal Code section 654.[1]

Respondent replies when a defendant maintains one criminal objective, he may be convicted and punished for each crime of violence against the same victim, citing *People v. Harrison* (1989) 48 Cal.3d 321, 337-338 [256

---

[1]Section 654 reads in pertinent part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ." All further statutory references are to the Penal Code unless otherwise specified.

Cal.Rptr. 401, 768 P.2d 1078]. *Harrison* is a multiple count sexual assault case where the court allowed separate and consecutive punishment on the basis of defendant's *intent*. Reasoning that defendant had a separate intent to obtain sexual gratification each time he committed a sexual penetration, the court held: "It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible. [Citations.] We have traditionally observed that if all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.] [¶] If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.] Although the question of whether defendant harbored a 'single intent' within the meaning of section 654 is generally a factual one, the applicability of the statute to conceded facts is a question of law. [Citation.]" (*Id.* at p. 335.)[2]

Here, defendant argues each shot manifested the same intent and criminal objective, which was to force Officer Bledsoe to break off his pursuit. However, we see no reason to limit *Harrison*'s reasoning to sex crimes. In *Harrison*, it could not be seriously maintained that each sexual penetration evinced a different type of intent and objective. Yet our Supreme Court held each could be punished separately because their objectives and underlying intents were separate and distinct. (48 Cal.3d at pp. 337-338.) "No purpose is to be served under section 654 by distinguishing between defendants based solely upon the type *or* sequence of their offenses. . . . [I]t is defendant's intent to commit a number of separate base criminal acts upon his victim, and not the precise code section under which he is thereafter convicted, which renders section 654 inapplicable." (*Ibid.*)

The purpose behind section 654 is "to insure that a defendant's punishment will be commensurate with his culpability. [Citation.]" (*People v. Perez*

---

[2]This "intent and objective" test, labeled by one commentator as the "same-transaction test" (Campbell, Law of Sentencing (2d ed. 1991) § 9:11, pp. 274-276), has been at least tacitly approved by the Supreme Court. (*Id.* at pp. 274-275; *Bell v. United States* (1955) 349 U.S. 81, 82-84 [99 L.Ed. 905, 909-911, 75 S.Ct. 620].) However, it is only one of three separate approaches to the issue of separate offenses and multiple punishment taken by the Supreme Court in an area which " 'is a veritable Sargasso Sea which could not fail to challenge the intrepid judicial navigator.' " (Campbell, *supra*, at p. 273, quoting *Albernaz v. United States* (1981) 450 U.S. 333, 343 [67 L.Ed.2d 275, 284, 101 S.Ct. 1137].)

(1979) 23 Cal.3d 545, 552 [153 Cal.Rptr. 40, 591 P.2d 63].)[3] Defendant's conduct became more egregious with each successive shot. Each shot posed a separate and distinct risk to Bledsoe and nearby freeway drivers. To find section 654 applicable to these facts would violate the very purpose for the statute's existence.

Furthermore, this was not a case where only one volitional act gave rise to multiple offenses. Each shot required a separate trigger pull. All three assaults were volitional and calculated, and were separated by periods of time during which reflection was possible. None was spontaneous or uncontrollable. "[D]efendant should . . . not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his . . . assaultive behavior." (*People v. Harrison, supra,* 48 Cal.3d at p. 338.)

Defendant, as he was driving, turned back, pointed, and shot his weapon. He resumed driving, paused for about a minute, turned back, and shot again. After another few seconds a third shot was fired. There was thus time prior to each shot for defendant to reflect and consider his next action. As the court remarked at sentencing, "[t]hey were separate acts of violence on different occasions coming down the freeway and putting different people— putting different officers in danger."

Section 654 is applicable when there is a single "act." But here, there were three separate acts, not one "made punishable in different ways by different provisions of [the Penal Code] . . . ." (§ 654; see also *Harrison, supra,* 48 Cal.3d at pp. 339-340 (conc. opn. of Mosk, J.).)

But, even under the long recognized "intent and objective" test, each shot evinced a separate intent to do violence just as each new and separate penetration in *Harrison* evinced a new and separate intent and objective. It is not the "nature" of the offenses which governs the applicability of section 654. If this were so, a defendant could be separately punished when the means used to perpetrate an assault were varied, but could not be separately punished if the means remained the same. This would lead to absurd results,[4] and is an approach which *Harrison* condemns. (48 Cal.3d at pp. 330-334.) Accordingly, the court here did not err in punishing defendant separately for two of the three assaults.

---

[3]Further corroboration of the fact *Harrison*'s section 654 analysis was not intended by our Supreme Court to be limited to sex crimes can be found in its reliance on *Perez*: "[*Perez's*] section 654 analysis was directed to *any* case in which 'a number of base criminal acts' were committed against a single victim. [Citation.]" (*People v. Harrison, supra,* 48 Cal.3d at p. 337, quoting *People v. Perez, supra,* 23 Cal.3d at p. 553.)

[4]For instance, if a defendant slashed his victim with a knife causing him to fall down, then paused, took out a gun and fired a fatal shot, no one could seriously dispute the fact each

## III. "Use" Versus "Armed"

■ Defendant contends he was found guilty of being armed with a firearm, which under section 12022 could not be charged as an enhancement to the crime of assault with a deadly weapon or firearm.[5]

The information alleged defendant personally used a firearm in the commission of the offenses, pursuant to section 12022.5.[6] The jury was properly instructed as to personal use pursuant to CALJIC No. 17.19 (5th ed. 1988 bound vol.). The preprinted verdict forms referenced the numerically correct section (§ 12022.5), but purported to find that defendant "was armed with a firearm . . . ," during the commission of the offenses. Defendant argues the wording in the verdict forms must be dispositive.

After the jury was discharged, but prior to sentencing, the prosecutor noted the discrepancy in the verdict forms and asked the court to modify them by interlineation, striking the word "armed" and adding the words "personally used." Over defense counsel's objection, the court granted the prosecution's motion and amended the verdicts.

Defendant asserts the trial court was without authority to amend the verdicts after the jury was discharged, as the verdicts were already complete within the meaning of section 1164.[7] But the court did nothing more than correct clerical errors in the verdict *forms*; the court did not modify the verdicts themselves. Clerical corrections to verdict forms after a jury has

---

could be punished separately. If we change these facts, however, so that defendant, after pausing, plunges the knife into his victim, logic dictates the result should be the same. But, if the nature of the offense or the means of its perpetration were dispositive, defendant could not be punished separately in the latter scenario.

Of course, the intent and objective test is controlling, and if defendant intended to kill with each assault it could be argued multiple punishment would be precluded. But even so, when defendant pauses and, having the option to land another blow or to break off the attack, chooses the former course of action, his culpability increases and his intent, though the same in kind, can be considered separate and distinct under *Harrison*. This, we think, is the more sensible approach and comports with the intent and meaning of section 654.

[5]This is a problem which we have seen all too many times in the past. Verdict forms should be checked to ensure they comport with the appropriate statutory language in the charging documents and in the statutes themselves. The failure to do so results in appellate issues which could be easily avoided.

[6]Section 12022.5, subdivision (d) specifically provides that "the additional term provided by this section may be imposed in cases of assault with a firearm . . . or assault with a deadly weapon which is a firearm under Section 245."

[7]Subdivision (a) of that section reads: "When the verdict given is receivable by the court, the clerk shall record it in full upon the minutes, and if requested by any party shall read it to the jury, and inquire of them whether it is their verdict. If any juror disagrees, the fact shall be entered upon the minutes and the jury again sent out; but if no disagreement is expressed, the verdict is complete, and the jury shall . . . be discharged from the case."

been discharged have been upheld in federal court. (*United States* v. *Stauffer* (9th Cir. 1990) 922 F.2d 508, 513-514.) Though *Stauffer* relied on a federal rule of criminal procedure allowing clerical mistakes in judgments or orders to be corrected, California has long recognized that a trial court has similar authority to correct clerical errors in court documents. (See 6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Judgment and Attack in Trial Court, § 3129, pp. 3861-3862; see also 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 68, pp. 502-503.) The court was authorized to make clerical corrections to the verdict forms.

Defendant responds that the error was not a clerical error but an error by the trier of fact which, as with a judicial error in rendering judgment, cannot be corrected by amendment. We disagree. First, the jury did not draft the verdict forms. Second, "The distinction between judicial errors which may not be corrected and clerical errors which may be remedied has been made to prevent a trial court from attempting to revise ' "its deliberately exercised judicial *discretion*." ' " (*People* v. *Jack* (1989) 213 Cal.App.3d 913, 917 [261 Cal.Rptr. 860], quoting *In re Candelario* (1970) 3 Cal.3d 702, 705 [91 Cal.Rptr. 497, 477 P.2d 729].) But the court did not revise any previous act of judicial discretion. "The distinction between clerical error and judicial error is 'whether the error was made in rendering the judgment, or in recording the judgment rendered.' [Citation.]" (*In re Candelario*, *supra*, at p. 705.) The revision affected only the jury's recordation of its verdict, not the actual verdict rendered. The incorrect wording was found in a preprinted verdict form given to the jury after they were properly instructed as to use. The error in the form was inadvertent, not advertent. (See 7 Witkin, Cal. Procedure, *supra*, Judgment, § 68 at pp. 500-501.) The jury filled in the form as they were instructed to do, and the court pronounced judgment for personal use. The judgment itself was never revised. This was a textbook example of clerical error.

Defendant seemingly concedes the issue of notice; his argument stands or falls on a determination whether the verdict forms were truly ambiguous. The jury was properly instructed and was not given an option of finding that defendant was armed as a lesser allegation. Although a finding of use necessarily includes an armed finding (*People* v. *Wischemann* (1979) 94 Cal.App.3d 162, 175 [156 Cal.Rptr. 386]), there was no duty to instruct on the lesser enhancement as it was not supported by the facts. (*People* v. *Romero* (1975) 48 Cal.App.3d 752, 758 [121 Cal.Rptr. 800].) The information charged the enhancement correctly and the parties' argument coincided with the instructions and clearly set forth the elements which had to be proven before the finding could be made. A better result would not have been obtained had the clerical error in the verdict forms not been present, and accordingly, we find any error to have been harmless. (*People* v. *Watson*

(1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[8] This aspect of the judgment must be affirmed.

## IV.-VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The abstract of judgment is ordered modified to strike the additional punishment for the section 12022.5 firearm use enhancement in the second assault (count V), reducing defendant's sentence by one year, four months. (§ 1260.) In all other respects, the judgment is affirmed.

Crosby, Acting P. J., and Sonenshine, J., concurred.

A petition for a rehearing was denied June 23, 1992, and appellant's petition for review by the Supreme Court was denied September 17, 1992. Mosk, J., was of the opinion that the petition should be granted.

---

[8]We do not address defendant's contention that the trial court was without authority to amend the jury's verdicts because we do not believe that is what occurred. The court did not change the jury's findings but only changed the wording used in the forms submitted to them. The court then pronounced judgment for personal use based on the jury's findings.

Defendant also contends to the extent the trial court interpreted or inferred the jury's intent from its verdicts, the verdicts were insufficient to convict. (See *People* v. *Soto* (1985) 166 Cal.App.3d 428, 437-438 [212 Cal.Rptr. 425].) We agree the trial court could not infer the jury's intent from ambiguous verdicts. However, the jury was not reconvened in violation of section 1164 to explain its verdict; the issue presented is simply whether there were ambiguities in the verdicts in the first instance. We hold there were not.

*See footnote, *ante*, page 363.