Filed 7/31/18; On rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G051876 |
| v. | (Super. Ct. No. 11WF0963) |
| TOM PHUNG, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, James A. Stotler, Judge. Reversed and remanded.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Randall D. Einhorn and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Tom Phung was 17 years old when he and fellow Tiny Rascal Gang (TRG) members, riding in about five cars, chased a fleeing vehicle containing eight rival gang members. A TRG member two cars ahead shot and killed one rival and seriously wounded a second. A jury convicted defendant, as an aider and abettor, of the lesser included crime of second degree murder (Pen. Code, § 187, subd. (a); count 1),[1] attempted murder (§§ 664, subd. (a), 187, subd. (a); count 2), shooting at an occupied motor vehicle (§ 246; count 3), and street terrorism (§ 186.22, subd. (a); count 4). With respect to the first three crimes, the jury found true the allegations that defendant committed them for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and vicariously discharged a firearm causing great bodily injury and death (former § 12022.53, subds. (d), (e)(1)).

The court sentenced defendant to an aggregate state prison term of 40 years to life, consisting of a 15-year-to-life term for second degree murder and a consecutive 25-year-to-life term for vicariously using a firearm in that crime; concurrently with count 1, a five-year term for attempted murder and a 25-year-to-life enhancement for vicariously using a firearm in that crime; and, also concurrently with count 1, a three-year term for shooting at an occupied vehicle and a 25-year-to-life enhancement for vicariously using a firearm in that crime. The court dismissed for sentencing purposes the gang enhancement to counts 1, 2, and 3. It imposed and stayed execution of sentence on the street terrorism conviction pursuant to section 654. Judgment was entered in April 2015. Defendant appealed.

While that appeal was pending, the electorate passed Proposition 57, the Public Safety and Rehabilitation Act of 2016, which went into effect in November 2016. (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303 (*Lara*).) Proposition 57, among other things, prohibits the direct filing of charges in criminal court against a

---

[1] All statutory references are to the Penal Code unless otherwise stated.

2

minor.  (Welf. & Inst. Code, § 707, subd. (a).)  Charges must be filed in juvenile court, and the district attorney must move the court for a transfer order to charge a minor as an adult in criminal court.  (*Lara,* at p. 303.)

In March 2017, we issued an opinion affirming the judgment.  (*People v. Phung* (2017) 9 Cal.App.5th 866, vacated by order on May 17, 2018.  In April 2017, defendant petitioned for review before the California Supreme Court.  While that petition was pending, another panel of this court issued *People v. Vela* (2017) 11 Cal.App.5th 68, review granted July 12, 2017, S242298 (*Vela*), which held that Proposition 57 operates retroactively under the rule announced in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).[2] Defendant's counsel, however, was unaware of the filing of the *Vela* opinion, and did not raise the issue before the California Supreme Court.  That court denied review, following which we issued the remittitur.

Approximately one week later, defendant filed a motion to recall the remittitur on the ground that his counsel had provided ineffective assistance of counsel in failing to raise the retroactivity of Proposition 57 to his own case.  (See *People v. Valenzuela* (1985) 175 Cal.App.3d 381, 394, overruled on other grounds by *People v. Flood* (1998) 18 Cal.4th 470, 490, fn. 12 ["The motion to recall the remittitur is granted on the sole ground that defendant . . . was deprived of his constitutional right to the effective assistance of appellate counsel."].)  Defendant's counsel admitted the error.  We granted the motion, recalled the remittitur, and solicited supplemental briefing.

In October 2017, defendant requested another round of supplemental briefing, this time on the retroactivity of Senate Bill No. 620 (2017-2018 Reg. Sess.) (SB 620), which amended the law so that courts now have discretion to strike firearm

---

[2] The *Vela* opinion was later partially published after transfer from the Supreme Court.  (*People v. Vela* (2018) 21 Cal.App.5th 1099.)

enhancements,[3] a discretion the court did not have when initially sentencing defendant. We granted the request and solicited further briefing.

In February 2018, the California Supreme Court issued *Lara, supra,* 4 Cal.5th 299, in which it adopted the rationale and holding of *Vela*, *supra*, 11 Cal.App.5th 68, review granted July 12, 2018, S242298. We subsequently vacated our prior opinion by order on May 17, 2018.

In section I of the "DISCUSSION" section of this opinion, we repeat the analysis from our original opinion affirming the judgment. In section II of the "DISCUSSION" section, we conclude that both Proposition 57 and SB 620 retroactively apply to defendant. Accordingly, we reverse and remand to hold a transfer hearing and to resentence defendant, as explained in greater detail *post*.


FACTS


*The Shooting*

On March 20, 2011, about 20 people were partying at Andrew Tran's home, including defendant (a TRG member) and Leesa Huynh. The people talked about "getting back at" rival gang Power of Vietnamese (POV) because POV had thrown a brick through a window of a TRG member's house, injuring the member's "little sister."

Around 11:00 p.m., Huynh left the party in a car driven by Tran. There were three other passengers in Tran's car — Benjamin Nguyen, Jonathan Tieu, and Skyler Avila. Nguyen gave Tran a gun, which Tran hid in the dashboard behind the car's radio. Nguyen was a Hellside gang member. Tieu was a TRG member. Tran and Avila had ties to both the TRG and Hellside gangs.

---

[3] (Stats. 2017, ch. 682, §§ 1, 2, eff. Jan. 1, 2018.)

4

Tran's group stopped at a restaurant, where they were joined by three or four other cars of people from the party, including Hellside gang members. From there, they drove to the parking lot of a pool hall where POV members were known to hang out at times. Tran's car arrived at the pool hall first. Eventually, there might have been a total of six or seven cars there.

Tran, Tieu, and Nguyen got out of the car and shouted at people in the pool hall, yelling, "Tiny Rascal Gang," "T.R.G., what's up?", and "Fuck VT." Huynh thought the men were shouting at people in TRG's rival gangs, i.e., POV, Asian Family (AF), and Viets Together (VT).

Tran and the others got back into the car. Nguyen sat in the front passenger seat. Tran repositioned his car in the parking lot. His car and several other vehicles formed a "barricade" that served as a "check point" for other vehicles trying to exit the parking lot.

One car drove by the barricade. Someone in Tran's car said, "That's not them." Then an SUV (sport-utility vehicle) drove by. Tran said, "That's them," and drove after the SUV onto Westminster Boulevard. Together with Tran's car, at least two other cars chased the SUV. When the SUV was in the middle lane, Tran's car switched to the left lane and was a little bit behind the SUV. Nguyen told Tran to accelerate.

Tran's car pulled up to the driver's side of the SUV. Nguyen shouted at the people in the SUV through the car's open window, asking what gang they were from. Nguyen had the gun Huynh had seen earlier. Inside the SUV, Scottie Bui (a POV gang member) said, "It's Puffy [Tran] and C.J. [Tien Phung]."

Huynh heard five gunshots emanate from the passenger side of Tran's car.

The SUV's driver told everyone to duck down. Two guys were "hit," including Bui. The SUV's occupants drove an unresponsive Bui to the hospital, carried him "over there," and left. Bui died from a gunshot wound to the head. Another male suffered great bodily injury from a shot to his neck.

5

After the shooting, the Tran group drove to a house in the "neighborhood," and then to get doughnuts, along with some other people who had been with them at the party and the pool hall.

At trial, a TRG member (who pleaded guilty to attempted murder and street terrorism based on the above underlying crimes) testified that TRG members are expected to "back up" each other in fights and that a member would be "checked," i.e., beaten up, if he failed to be a back up. He identified defendant in court as a fellow TRG member and testified that defendant's brother Tien Phung was the leader of TRG at the time of the shooting.

*Defendant's Police Interview*

Almost three months later, on June 16, 2011, a police officer interviewed defendant. A video recording of the interview was played for the jury and a transcript was distributed. In the interview, defendant gave the officer the following account of his relationship with TRG and the events of the night of March 20, 2011 and the early morning hours of March 21, 2011.

Defendant was 17 years old and had been on probation since he was 13 or 14 years old. Defendant did not associate with TRG; he had "stopped hanging out with them since [his] last incident . . . . [He] helped the other detective, [he] went to school, [he] got [his] laser [tattoo] removed . . . ." He had already had 14 painful laser treatments to remove a TRG tattoo from his back.

Defendant was at the party the night of the shooting, but left to go to his then girlfriend's house because her mother was away from the home. He paid Cynthia to drive him to the girlfriend's house.[4] He was there until 1:00 or 2:00 a.m. Defendant phoned his brother to come pick him up, but his brother came and did not see him.

---

[4]     The gang expert identified Cynthia as Cynthia Sipaseuth.

Defendant talked on the phone to a TRG member who told him there were "VT's at the pool hall" and that defendant should come down there. Around 2:00 a.m., Cynthia and Anthony Le picked defendant up.

With defendant in the backseat, they went to a McDonald's restaurant and then to the pool hall after learning that VT, POV, and AF members were there. Defendant anticipated his group would "jump" (fight) the rival gang members. He went there to back up TRG. He knew his help was not needed because the rivals' single car was out-numbered by defendant's fellow gang members' five cars. But he would have jumped in to help if needed.

His brother "came out of nowhere," stopped the car, and asked "what the hell is going on." There were a lot of cars and confusion; people passing by said that a Lexus SUV was the enemy car. Tran's car was "right behind it." Defendant heard shooting. Three cars were behind him, including his brother's car. They then went to the house of a Hellside gang member, where Hellside members said they had shot and missed. "And they were yelling and saying that why you miss and just make me feel terrible and sat there, you know, everybody just left, back doing their own thing and I went with my brother."

Defendant had started "kicking it" with TRG in 2008. He was "the good one" in his family, the only one with "a high school diploma." His older brother, Tien Phung, did not want him to "screw up" his life, so Tien Phung only let him associate with the gang. Defendant's girlfriend let him "hang out" with TRG, but would not let him join it. As a result of defendant's association with the gang, he would back them up because he would expect the same from them. Hellside had the "straps," i.e., guns. TRG did not "hook[] up" with Hellside, but the two gangs had the same enemies.

*Expert Testimony*

The People's gang expert described Asian street gang culture and behavior in general, and TRG in particular. The expert explained that Asian gangs are very mobile and do not have a neighborhood, but instead hang out at certain places like pool halls and restaurants. They are secretive about their gang affiliation and do not openly claim their gang, although they do get tattoos and dress in a gang-identifiable way. If a gang is victimized by a rival gang, they lose respect and have to use equal or greater violence against that rival.

The expert opined that TRG is a criminal street gang in Orange County and other places, and that defendant and his brother Tien were active members of TRG on the date of the shooting. TRG's enemies are VT, POV, and AF. TRG gets along with Hellside and True (or Tiny) Oriental Posse. Most TRG members are between 15 and 21 years old. TRG's primary activities include murder, assault with a deadly weapon, illegal possession of firearms, and narcotic sales.

DISCUSSION

I

*The Original Opinion*

*Defendant's Eighth Amendment Challenge to his Sentence Lacks Merit*

Defendant contends that the "statutorily mandated imposition" on him of an "enhanced 40-year-to-life prison term for second degree murder as a passive aider-abettor, under a 'natural and probable consequences' theory of criminal liability, based on disturbing the peace," which includes a 25-year-to-life vicarious gun discharge enhancement, "with no statutory discretion allowed to the trial court to consider [his] age or personal circumstances or passive and nonviolent criminal behavior in mitigation of the punishment, constituted excessive punishment and violated, as applied to him, [his]

8

constitutional rights under the Eighth and Fourteenth Amendments and article I, section 17, of the California Constitution." He concludes "automatic reversal of the enhanced sentences imposed on Counts 1 through 3 is warranted." He requests this court to strike his section 12022.53, subdivisions (d) and (e)(1) gun enhancements and to reduce his sentence to 15 years to life.

### 1. The sentencing hearing

At the sentencing hearing (which took place when defendant was 21 years old), defense counsel argued the court's tentative sentence of 40 years to life appeared to be "grossly disproportionate to the conduct," in light of defendant's "conduct" and "background." Defense counsel argued: "[T]he home life that this man had was terrible. His mother [isn't] in the situation[; his] older brother is in the gang. [Defendant] was doing very well. Probation interviewed the people at the group home that he was living at simply because mother couldn't take care of anybody, and they were very, very surprised. He was doing so well. . . . [H]e was having tattoos removed to try and get away . . . from the problem of gangs. But when you have nowhere to live and you have brothers, your friends, older brothers and their friends that are gang members, it makes it very, very difficult. [¶] . . . [T]his young man found himself in a very difficult position. I think the evidence was pretty clear that he did not know about a gun, that . . . he wasn't present when the people came to the party and they talked about some sort of revenge. He had already left. He was at [his] ex-girlfriend's house, and it was the brother coming back by to pick him up because he was going to stay with the brother. And he gets in the backseat of the car, not his brother's car but someone else['s], and they're going over to where this confrontation may[]be. [¶] The [interrogating] officer got what he wanted . . . him to say, '[W]ell, I'd help out if there was a fight.' [¶] And those words are what got him a second degree murder conviction."

9

The prosecutor argued that this event was "based on a bunch of people who didn't really do anything, and yet we have a dead body and another young man shot in the neck." Responsibility "is shared when a group of people get together and make an event more likely to occur . . . ." The size of the group and "cloud of anonymity" increase the chances of a gang succeeding without individual detection.

The probation report (which the court had considered) gave the following information about defendant's personal and family circumstances. His probation officer first began supervising him when he was 14 years old. At that time, his father had left the family several years earlier and his oldest brother was in prison. His mother, who "could not maintain a home," was mentally unstable and could not work. She depended on CalWORKS (California Work Opportunity and Responsibility to Kids) to support the family. After defendant and his brother Tien "became too much for their mother to handle," she gave up her Wraparound apartment and disappeared. Defendant was placed in a group home where he "did extremely well." He had worked "several internships" and "was reported to be a hard worker." He graduated from high school and had a job interview scheduled the week of his arrest. The probation officer stated that "he seemed to have turned his life around and had a bright future ahead of him." In a jail interview, defendant said he had spent a year in a group home trying to get out of the gang lifestyle and that his probation officer had told him that if he got his tattoos removed, paid restitution, graduated from high school, and found a job, his probation period would end when he turned 18 years old. Defendant was the first person in his family to obtain a high school diploma. The only work experience he had was as an intern in the Irvine Unified School District's regional occupational program, through which he had done stock work and customer service at a Smart and Final store, and had walked dogs and done maintenance work at the Pet Poundery. Defendant's oldest brother was homeless and his two other brothers were incarcerated.

10

The trial court found a 40-year-to-life term was not a life without possibility of parole sentence nor was it a "de facto" life sentence (in light of defendant's life expectancy of 76 years, as well as the statutory "juvenile parole hearing"). The court believed it had the discretion to impose a lesser sentence. The court stated it had "considered the defendant's youth, the attend[ant] circumstances here, the nature of the crime, [and] the juvenile's lesser culpability in this case because he's an aider and abettor as opposed to a perpetrator." The court further stated that it had considered the factors outlined in *Miller v. Alabama* (2012) 567 U.S. 460, 489 (*Miller*) regarding a "juvenile's lesser culpability[,] seemingly a concept that includes more than simply age," "a juvenile's greater capacity for change," and "a juvenile offender who did not kill or intend to kill [having] a twice diminished moral culpability" "when compared with an adult murderer." The court noted defendant's record of multiple prior juvenile adjudications starting when he was 13 years old, including weapons possessions, battery, felony burglary, vandalism, possession of stolen property, and a gang-related assault with a deadly weapon. The court gave defendant "the benefit of the doubt" that he was trying to remove his gang tattoos "because he was trying to get out of the gang lifestyle." The court looked "at the big picture," in which a group of young people had hunted down another gang and all of them had arrived "for purposes of inflicting violence, even though some of them [were] only there for back up," in what was basically "an ambush [when] they called the [rivals] out of the pool hall." The court sentenced defendant to a principal aggregate term of 40 years to life for second degree murder with a vicarious gun enhancement.

2. Applicable law

The Eighth Amendment's ban on "cruel and unusual punishment" prohibits (1) the death penalty for any juvenile offense (See *Roper v. Simmons* (2005) 543 U.S. 551, 578); (2) life without parole (LWOP) for juvenile nonhomicide offenses (*Graham v.*

11

*Florida* (2010) 560 U.S. 48, 82 (*Graham*)); and (3) *mandatory* LWOP for juvenile homicide offenses (*Miller*, *supra*, 567 U.S. at p. 489).  Furthermore, "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy" violates the Eighth Amendment because such a sentence is the "'functional equivalent'" of LWOP.  (*People v. Caballero* (2012) 55 Cal.4th 262, 265, 267-268 (*Caballero*) [concerning a 110-year-to-life sentence for a 16-year-old nonhomicide offender].)  Similarly, the Eighth Amendment protects a juvenile *homicide* offender from a *mandatory* indeterminate sentence that is equivalent to LWOP.  (*People v. Franklin* (2016) 63 Cal.4th 261, 276 (*Franklin*).)  And, although juvenile homicide offenders are shielded only from mandatory LWOP (actual or de facto), the Unite States Supreme Court in *Miller* stated that the instances where a juvenile homicide offender could constitutionally be sentenced to LWOP would be uncommon, because rarely would a juvenile offender's "'crime reflect[] irreparable corruption.'"  (*Miller*, at pp. 479-480.)[5]

As to all the above LWOP restrictions, a "State need not guarantee the [juvenile] offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term."  (*Graham*, *supra*, 560 U.S. at p. 82.)  More specifically, the State must provide "'some meaningful opportunity to obtain release based on demonstrated maturity and

_____

[5]     *Miller* did not decide the appellants' "alternative argument that the Eighth Amendment requires a categorical bar on [LWOP] for juveniles, or at least for those 14 and younger."  (*Miller*, *supra*, 567 U.S. at p. 479.)  Nonetheless, the high court stated, "[W]e think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.  That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'  [Citations.]  Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."  (*Ibid*., fn. omitted.)

rehabilitation.'" (*Miller*, *supra*, 567 U.S. at p. 479; see *Caballero*, *supra*, 55 Cal.4th at pp. 268-269.)

The rationale for this special treatment of juvenile offenders is that "children are constitutionally different from adults for purposes of sentencing" in at least three ways. (*Miller*, *supra*, 567 U.S. at p. 471.) "First, children have a '"lack of maturity and an underdeveloped sense of responsibility,"' leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'" (*Ibid.*)

In *Caballero*, the California Supreme Court "urge[d] the Legislature to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto [LWOP sentence for juvenile] nonhomicide crimes . . . with the opportunity to obtain release on a showing of rehabilitation and maturity." (*Caballero*, *supra*, 55 Cal.4th at p. 269, fn. 5.) In response, the California Legislature enacted Senate Bill No. 260 (2013-2014 Reg. Sess.) sections 1 and 4, which added section 3051 to and amended section 4801 to the Penal Code. Section 1 of Senate Bill No. 260 states in part: "The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with [*Caballero*, *Graham*, and *Miller*]. . . . It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (See Stats. 2013, ch. 312, § 1.)

13

Section 3051, subdivision (a)(1) provides, "A youth offender parole hearing is a hearing by the Board of Parole Hearings for the purpose of reviewing the parole suitability of any prisoner who was under 23 years of age at the time of his or her controlling offense."[6] The prisoner's "'controlling offense'" is "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (§ 3051, subd. (a)(2)(B).) If the prisoner is serving a term of 25 years to life for a controlling offense, he or she is "eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (*Id*., subd. (b)(3).) A prisoner serving a life term of less than 25 years to life for a controlling offense is eligible for release after a youth offender parole hearing during the 20th year of incarceration, unless previously statutorily released or entitled to earlier parole consideration. (*Id*., subd. (b)(2).) A prisoner serving a determinate sentence for a controlling offense is eligible for release after a youth offender parole hearing during the 15th year of incarceration, unless previously statutorily released. (*Id*., subd. (b)(1).) In all cases, the "youth offender parole hearing to consider release shall provide for a meaningful opportunity to obtain release." (*Id*., subd. (e).) The statute does not apply "to three strikes sentences, one strike sentences, or LWOP sentences, or to those who commit certain additional offenses after reaching the age of [23]." (*People v. Scott* (2016) 3 Cal.App.5th 1265, 1278 (*Scott*); see § 3051, subd. (h).)

Section 4801, subdivision (c) provides, "When a prisoner committed his or her controlling offense . . . prior to attaining 23 years of age, the board, in reviewing a prisoner's suitability for parole . . . , shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law."

---

[6] Prior to a 2015 amendment, sections 3051 and 4801 applied to inmates who were under 18 years of age at the time of the offense. (Stats. 2015, ch. 471.)

14

Sections 3051 and the amended section 4801 became effective on January 1, 2014, approximately 15 months before defendant was sentenced on April 3, 2015.

While this appeal was pending, the California Supreme Court decided *Franklin*, *supra*, 63 Cal.4th 261. In *Franklin*, a jury convicted the juvenile offender "of first degree murder and found true a personal firearm-discharge enhancement. The trial court was obligated by statute to impose two consecutive 25-year-to-life sentences, so [his] total sentence was life in state prison with the possibility of parole after 50 years." (*Id.* at p. 268.) Our Supreme Court held that "sections 3051 and 4801 — recently enacted by the Legislature to bring juvenile sentencing in conformity with *Miller*, *Graham*, and *Caballero* — moot[ed the defendant's] constitutional claim."[7] (*Franklin*, at p. 268.) Consequently, *Franklin* did "not decide whether a life sentence with parole eligibility after 50 years of incarceration is the functional equivalent of an LWOP sentence and, if so, whether it [was] unconstitutional in" that case. (*Ibid.*)

3. Under *Franklin*, defendant's challenge to his sentence lacks merit

After we granted defendant's motion to submit supplemental briefing on *Franklin's* effects (if any) on this case, both parties submitted supplemental briefs. Defendant continues to request this court to reduce his sentence to 15 years to life, contending that, even in *Franklin's* aftermath, his minimum term of 25 years to life, "when viewed in light of the particular circumstances of his life and his crime, remains excessive punishment prohibited by the Eighth Amendment and the state constitution." He bases his contention on two alternative assertions. He first asserts that *Franklin* is not "stare decisis" as to his argument that *Miller's* reasoning "should extend logically to a harsh non-LWOP indeterminate life sentence." Alternatively, he asserts the Supremacy Clause requires this court to disregard *Franklin* because *Franklin* allegedly contravenes

[7] The Franklin defendant was sentenced *before* sections 3051 and the amended 4081 became effective.

15

*Miller* by failing to require a sentencing court to factor in a juvenile's individualized factors *at the time of sentencing*.

As to defendant's "stare decisis" contention, he argues that *Franklin* did *not* decide the exact issue presented here, i.e., whether a "severe *non*-LWOP indeterminate life sentence[ is] subject to the sentence-mitigating considerations of *Miller* by logical extension." He notes that in *Franklin*, the defendant argued his 50-year-to-life term was the functional equivalent of an LWOP sentence (*Franklin*, *supra*, 63 Cal.4th at p. 273), whereas, here, defendant asserts his 40-year-to-life term is severe, but "not quite the functional equivalent of LWOP." This distinction has no bearing, however, on whether *Franklin* constitutes controlling, or persuasive, precedent for the case at hand. This is because *Franklin* never reached the defendant's contention that his 50-year-to-life term was effectively an LWOP sentence. Rather, *Franklin* held the issue was moot because sections 3051 and 4801 have "superseded the statutorily mandated sentences of" most juvenile inmates by providing them "with a parole hearing during or before their 25th year of incarceration." (*Franklin*, at p. 278.) Like the defendant in *Franklin*, defendant here "is now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration. Such a sentence is neither LWOP nor its functional equivalent. Because [he] is not serving an LWOP sentence or its functional equivalent, no *Miller* claim arises here." (*Id.* at pp. 279-280.)[8]

---

[8] Defendant argues, "Although *Graham* and *Miller* specifically address LWOP situations, their open-ended language about the 'most serious penalties,' 'harshest sentences,' or 'most severe punishments' can be read reasonably to extend logically beyond LWOP and death-penalty cases to other harsh or severe indeterminate-life sentences imposed mandatorily on juveniles like" him. We note, first, that defendant does not dispute the Attorney General's statement that "no court has held that a sentence of 40 years to life for a juvenile offender is cruel and unusual."

Defendant nevertheless argues that his effective term of 25 years to life under section 3051 is excessive, or grossly disproportionate, punishment "when the particular circumstances of his life and his crime are viewed through the youth-based sentence-mitigating lens of *Miller*." He stresses that, unlike the defendant in *Franklin*, he

Alternatively, defendant contends *Franklin* "is directly contrary to the holding of *Miller* that a sentencing judge must impose an 'individualized' sentence for a juvenile facing 'the most serious penalties,' and must yield to that holding by operation of the Supremacy Clause." He argues *Miller* requires the sentencing judge (as opposed to a parole board 25 years later) "to tailor the juvenile's sentence — i.e., to confect an 'individualized sentence'" by factoring in "the particular circumstances of the juvenile's life and crime, in light of the youth-based mitigation factors of *Miller*." In his view, a sentencing court must "consider a particular juvenile offender's 'youth' and 'special' or

"was not the actual shooter/killer, but someone sitting in the back seat of a vehicle that was not involved in the shooting but was removed from where the shooting took place." But, although Franklin was indeed the actual shooter/killer (*Franklin*, *supra*, 63 Cal.4th at p. 270), the provocation for the shooting included that members of the victim's gang had shot into Franklin's "home while his family was inside," "shot the windows out of [his] mother's car and slashed her tires," came to Franklin's classroom and displayed a gun as a threat (*id.* at p. 269), and attacked his 13-year-old brother (*ibid.*). Franklin's older brother had loaned him a gun for protection the morning of the murder. (*Ibid.*) "Franklin testified at trial that he was angry and afraid for his family. He did not know what the [victim's] gang was going to do next and wanted to confront them. According to Franklin, he did not plan to shoot anyone but knew there was a 'possibility that [he] might.'" (*Id.* at p. 270.) Thus, 16-year-old Franklin acted impulsively, was subject to negative influences and pressures from his family and peers, and was unable to extricate himself from a "horrific, crime-producing setting[]." (*Miller*, *supra*, 567 U.S. at p. 471.)

In terms of factual distinctions between *Franklin* and the case at hand, although defendant here was not the actual shooter, he knew that rival gang members were at the pool hall and he went there to back up TRG and to jump in if needed. When he thought that the actual shooter had missed the target, he felt terrible. At the time of the shooting, defendant was 17 years and seven months old, just five months shy of adult status. *Miller's* youth-based sentence-mitigating factors do not entitle defendant to a parole hearing prior to the 25th year of his sentence (for example, during the 15th year of his sentence, if his mandatory 25-to-year-life gun enhancement under section 12022.53, subdivisions (d) and (e)(1) [regarding gang members], were held to violate the Eighth Amendment). Defendant's appellate counsel acknowledges he is "unaware of any reported decision authorizing a sentencing court in a murder case to mitigate a juvenile's automatic indeterminate-life punishment under section 12022.53[, subdivisions] (d)/(e)(1) when the resultant enhanced sentence is not a de facto or de jure LWOP sentence."

17

'attendant' circumstances, as 'sentencing factors,' which may point to the minor's 'crime reflect[ing] "'unfortunate yet transient immaturity'"' but not 'irreparable corruption.'"

The problem with defendant's argument is that, in the vast majority of cases, a judge will be unable to determine, at the time of sentencing, whether the juvenile offender suffers only from transient immaturity as opposed to irreparable corruption. This is because of "the *great difficulty* . . . of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" (*Miller*, *supra*, 567 U.S. at pp. 479-480, italics added.) "'It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" (*Graham*, *supra*, 560 U.S. at p. 73.) A "child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'" (*Miller*, at p. 471.) A child has the capacity to change. (*Graham,* at p. 68.) "*Graham* mandates the chance to obtain release based on demonstrated maturity and rehabilitation. This crucial determination cannot in most cases be achieved at sentencing because the juvenile offender will not yet have had an opportunity to exhibit these traits. Rehabilitation and maturity await the passage of time before they can reliably reveal themselves, and this is precisely what *Graham* directs." (*Scott*, *supra*, 3 Cal.App.5th at p. 1280.)[9]

---

[9] In his supplemental reply brief, defendant places great reliance on the U.S. Supreme Court's recent decision in *Montgomery v. Louisiana* (2016) 577 U.S. ___ [136 S.Ct. 718] (*Montgomery*). Defendant contends that "*Montgomery* explains portions of the *Miller* decision that are pertinent to the instant appeal."

*Montgomery* held that "*Miller* announced a substantive rule that is retroactive in cases on collateral review." (*Montgomery*, *supra*, 577 U.S. at p. ___ [136 S.Ct. at p. 732].) In explaining this conclusion, *Montgomery* summarized in less than four pages *Miller's* 15-page decision. (*Montgomery*, at p. ___ [136 S.Ct. at pp. 732-735].) Necessarily, *Montgomery's* summary provides merely a shorthand description of *Miller's* reasoning. Nonetheless, defendant argues that the U.S. "Supreme Court in

"It is for the State, in the first instance, to explore the means and mechanisms for" complying with *Graham's* requirement that juvenile offenders be given a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Graham*, *supra*, 560 U.S. at p. 75.) Section 3051 establishes what is, in the view of the Legislature of this State, "the appropriate time to determine whether a juvenile offender has 'rehabilitated and gained maturity' . . . ." (*Franklin*, *supra*, 63 Cal.4th at p. 278.) The "criteria for parole suitability set forth in . . . sections 3051 and 4801 contemplate that the Board's decision making at [the] eventual parole hearing will be informed by youth-related factors, such as his cognitive ability, character, and social and family background at the time of the offense." (*Id.* at p. 269.) Consequently, a trial court must afford the parties an opportunity "to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors (§ 4801, subd. (c)) in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime 'while he was a child in the eyes of the law'

---

*Montgomery* describes the *Miller* decision in terms of what Eighth Amendment principles require the sentencing court to consider at the time when the minor is being sentenced [citation], and *not* at some future time when the minor may qualify for parole consideration (as, for example, under section 3051)."

     *Montgomery* does state: "Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects '"unfortunate yet transient immaturity."' [Citations.] Because *Miller* determined that sentencing a child to life without parole is excessive for all but '"the rare juvenile offender whose crime reflects irreparable corruption,"' [citations], it rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status' — that is, juvenile offenders whose crimes reflect the transient immaturity of youth." (*Montgomery*, *supra*, 577 U.S. at p. ___ [136 S.Ct. at p. 734].)

     The above excerpt from *Montgomery* cites to the passage in *Miller* which recognizes the difficulty of distinguishing at an early age between an immature but remediable juvenile and an irreparably incorrigible one. We decline to place inordinate reliance on *Montgomery's* shorthand summary of what *Miller* says, rather than on *Miller's* own language in its original context.

19

[citation]." (*Franklin*, at p. 284.)  Sections 3051 and 4801 (together with the bans on death penalty, LWOP, and de facto LWOP sentences established in *Roper*, *Graham*, *Miller*, *Caballero*, and *Franklin*) guarantee that imposition of punishment on a juvenile offender in this State proceeds with full recognition that he or she was a child when committing the crime.

In sum, *Franklin* does not contravene *Miller*.  And, in any case, defendant did, in fact, receive individualized sentencing from the trial judge, who expressly considered "defendant's youth," "the atten[dant] circumstances" in this case, "the nature of the crime," his "lesser culpability in this case because he's an aider and abettor as opposed to a perpetrator," "a juvenile's greater capacity for change," and defendant's criminal history (which started "at age 13").  Accordingly, under the rationale of *Franklin*, and the individualized sentencing defendant received, his constitutional challenge to his sentence lacks merit.

*Defendant's Punishment for Count 3 Is Not Barred by Section 654*

Defendant contends his concurrent sentence for the count 3 crime of shooting at an occupied vehicle should be stayed under section 654 on grounds it is based on the same act and continuous course of conduct as his crimes of murder and attempted murder — i.e., "sitting in the back of a car during a shooting incident."

Section 654, subdivision (a), provides:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654 "'literally applies only where [multiple] punishment arises out of multiple statutory violations produced by the "same act or omission."  [Citation.] However, . . . its protection has been extended to cases in which there are several offenses committed during "a course of conduct deemed to be indivisible in time."  [Citation.]'"

20

(*People v. Hicks* (1993) 6 Cal.4th 784, 789.) As explained by our Supreme Court in *People v. Britt* (2004) 32 Cal.4th 944, 951-952: "'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.] A decade ago, we criticized this test but also reaffirmed it as the established law of this state. [Citation.] We noted, however, that cases have sometimes found separate objectives when the objectives were either (1) consecutive even if similar or (2) different even if simultaneous. In those cases, multiple punishment was permitted."

A defendant's criminal objective should not be defined too broadly and amorphously. In *People v. Perez* (1979) 23 Cal.3d 545, our Supreme Court "held that the defendant could be separately punished for separate sex offenses against the same victim. '[F]ocus[ing] on the question whether defendant should be deemed to have entertained single or multiple criminal objectives' [citation], [*Perez* ] rejected the defendant's argument that he had but a single objective in committing each sex offense — to obtain sexual gratification. 'Such an intent and objective is much too broad and amorphous to determine the applicability of section 654. . . . To accept such a broad, overriding intent and objective to preclude punishment for otherwise clearly separate offenses would violate the statute's purpose to insure that a defendant's punishment will be commensurate with his culpability.'" (*People v. Britt*, *supra*, 32 Cal.4th at p. 953.)

In *People v. Trotter* (1992) 7 Cal.App.4th 363, the defendant fired a gunshot at a police car, then fired a second shot about a minute later, and seconds later fired a third shot. (*Id.* at p. 366.) The trial court imposed consecutive sentences for two of the assaults, and the appellate court affirmed the sentence, stating: "Each shot posed a separate and distinct risk to [the officer] and nearby freeway drivers. . . . Each shot required a separate trigger pull. All three assaults were volitional and calculated, and

21

were separated by periods of time during which reflection was possible. None was spontaneous or uncontrollable. '[D]efendant should . . . not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his . . . assaultive behavior.'" (*Id.* at p. 368.)

Here, substantial evidence shows a separate intent and objective for murder, attempted murder, and shooting at an occupied vehicle. (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1466, disapproved on another ground in *People v. Mesa* (2012) 54 Cal.4th 191 [whether defendant held multiple criminal objectives is factual question subject to substantial evidence standard of review]; *People v. Blake* (1998) 68 Cal.App.4th 509, 512 [trial court's implied finding defendant harbored separate intents and objectives upheld on appeal if supported by substantial evidence].)[10] An appellate court views the evidence in a light most favorable to the respondent and presumes in support of the sentencing order the existence of every fact the trier could reasonably deduce from the evidence. (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113.) So viewed, the record shows that (1) the rival gang-occupied SUV contained eight people, (2) around five bullets were shot at the SUV, which was later found to have three bullet holes in it, and (4) officers found five expended bullet casings and one bullet at the scene. The crime of shooting at an occupied vehicle "is not limited to shooting *directly* at [the] occupied target." (*People v. Overman* (2005) 126 Cal.App.4th 1344, 1355-1356.) Rather, the applicable statute "proscribes shooting *either* directly at *or* in close proximity to an . . . occupied target under circumstances showing a conscious disregard for the probability that one or more bullets will strike the target or persons in or around it." (*Id.* at p. 1356.)

---

[10] Because defendant did not lodge a section 654 objection below to the concurrent sentence on count 3, the court made no finding on the issue. Nonetheless, defendant may raise the issue on appeal. (*Scott, supra*, 9 Cal.4th at p. 354 & fn. 17.)

Two persons in the SUV were struck by bullets. Those two persons were the named murder (count 1) and attempted murder (count 2) victims. Each of the five gunshots involved a consecutive (albeit similar) intent and objective. As in *Trotter* (and in the Attorney General's words), "each shot fired at the SUV was a separate trigger pull, accompanied by a separate intent and objective, and constituted a separate risk to its passengers . . . ."[11]

Thus, we conclude the court properly punished defendant for count 3.

*Defendant's Abstract of Judgment Must Be Corrected*

Defendant correctly points out that his abstract of judgment incorrectly describes his conviction for count 3 as discharging a firearm at an "inhabited dwel[ling]." We will direct the trial court to correct defendant's abstract of judgment to accurately describe his conviction for count 3 as shooting at an "occupied motor vehicle."

II

*Proposition 57, and SB 620*

"In November 2016," while the appeal in this case was pending, "the electorate passed Proposition 57, the 'Public Safety and Rehabilitation Act of 2016' (Proposition 57). Proposition 57 prohibits prosecutors from charging juveniles with crimes directly in adult court. Instead, they must commence the action in juvenile court.

---

[11] Because the gunshots reflected separate intents and objectives, we do not address the Attorney General's alternative argument the multiple victim exception applies. As to this exception, defendant argues: "*Trotter* pertained to three counts of assault on a peace officer, each of which counts involved a specific victim (the identical officer). Unlike the counts in *Trotter*, the section 246 count here has no named victim and needs none." Nonetheless (and without commenting on the merits of that argument), we simply repeat that *Trotter's* analysis concerning the separate intent and objective test is applicable to the case at hand.

23

If the prosecution wishes to try the juvenile as an adult, the juvenile court must conduct what we will call a 'transfer hearing' to determine whether the matter should remain in juvenile court or be transferred to adult court. Only if the juvenile court transfers the matter to adult court can the juvenile be tried and sentenced as an adult." (*Lara, supra,* 4 Cal.5th at p. 303.)

We must decide whether this part of Proposition 57 applies retroactively to benefit defendant. In *Estrada*, *supra*, 63 Cal.2d 740 the California Supreme Court "held that a statute that reduced the punishment for a crime applied retroactively to any case in which the judgment was not final before the statute took effect." (*Lara, supra,* 4 Cal.5th at p. 303.) At the time defendant and the People filed their supplemental briefing on this issue, there was a split in the Courts of Appeal regarding whether Proposition 57 amounted to a reduction in punishment such that the *Estrada* rule of retroactivity applies. (See *id.* at p. 310.) Since that briefing, the California Supreme Court has resolved the issue. *Estrada* applies. (*Id.* at p. 303.)

The *Lara* court expressly approved of the disposition reached in *Vela*, *supra*, 11 Cal.App.5th 68, review granted. (*Lara, supra,* 4 Cal.5th at p. 313.) *Vela* provided the following instructions to the trial court, which were republished in *People v. Vela*, *supra*, 21 Cal.App.5th 1099, following remand from the Supreme Court: "The cause is remanded to the juvenile court with directions to conduct a transfer hearing, as discussed within this opinion, no later than 90 days from the filing of the remittitur. If, at the transfer hearing, the juvenile court determines that it would have transferred [the defendant] to a court of criminal jurisdiction, then the convictions shall be reinstated as of that date." (*Id.* at p. 1114.) "If, at the transfer hearing, the juvenile court determines that it would not have transferred [the defendant] to a court of criminal jurisdiction, then [the defendant's] criminal convictions and enhancements will be deemed to be juvenile adjudications as of that date. The juvenile court is then to conduct a dispositional hearing

24

within its usual time frame." (*Id*. at pp. 1114-1115.) We echo those instructions for the trial court in this case.

After we recalled the remittitur in this case, and thus when the case was not final, Governor Brown signed SB 620 into law, which took effect on January 1, 2018. (*People v. Matthews* (2018) 21 Cal.App.5th 130, 132.) That bill amended Penal Code sections 12022.5 and 12022.53, which set forth firearm enhancements, so that the court may now, in its discretion, strike the enhancements in the interests of justice. (Pen. Code, §§ 12022.5, subd. (c), 12022.53, subd. (h).) The People concede that the *Estrada* rule of retroactivity applies to SB 620 and that we should remand to the trial court to exercise its discretion in deciding whether to strike the firearm enhancements. We agree.

DISPOSITION

The judgment is conditionally reversed. The cause is remanded with instructions that it be transferred to the juvenile court to conduct a transfer hearing no later than 90 days from the filing of the remittitur.

If, at the transfer hearing, the juvenile court determines that it would have transferred defendant to a court of criminal jurisdiction, then the matter shall be transferred to the criminal court and defendant's conviction is to be reinstated. The court shall then resentence defendant and must exercise its discretion under SB 620.

If, at the transfer hearing, the juvenile court determines that it would not have transferred defendant to a court of criminal jurisdiction, then defendant's criminal convictions and enhancements will be deemed juvenile adjudications as of the date of the verdict. The juvenile court shall exercise its discretion pursuant to SB 620 in deciding whether to strike the firearm enhancements. The juvenile court is then to conduct a dispositional hearing within its usual timeframe.


IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.