Filed 2/28/23  P. v. Rodgers CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079605 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD284166) |
| MILTON MELVIN RODGERS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Francis M. Devaney, Judge.  Affirmed in part, vacated in part and remanded with directions.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Paige B. Hazard and Steve T. Oetting, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Milton Melvin Rodgers of discharging a firearm in a grossly negligent manner (Pen. Code,[1] § 246.3, subd. (a); counts 1, 5, & 10), being a felon in possession of a firearm (§ 29800, subd. (a)(1); counts 2, 6 & 11), possession of ammunition by a felon (§ 30305, subd. (a); counts 3 & 7), possession of a firearm by a possessor of a controlled substance (Health & Saf. Code, § 11370.1, subd. (a); count 4), and shooting at an inhabited dwelling house (§ 246; counts 8, 12 & 13). It found true allegations that in committing counts 1, 5, 8, 10 and 12, Rodgers personally used a firearm (§ 1192.7, subd. (c)(23)). The jury found Rodgers not guilty of another charge of grossly negligent firearm discharge; count 9).

The court sentenced Rodgers to a 12-year 4-month prison term consisting of a 7-year upper term on count 8 and consecutive terms of one-third the midterm for counts 1 (8 months), 5 (8 months), 10 (8 months), 12 (20 months), and 13 (20 months). It imposed concurrent 16-month low terms for counts 2, 6, and 11, and a concurrent two-year low term on count 4. The court stayed 16-month low term sentences for counts 3 and 7.

Rodgers contends the trial court erred when, contrary to its pretrial ruling, it admitted evidence of his 2012 conviction of being a felon in possession of a firearm by allowing the prosecutor to improperly impeach him with that conviction. He maintains the error requires that we reverse his convictions on counts 5 through 8, and 10 through 13. Rodgers further contends we must reverse his count 5 conviction for discharging a firearm in a grossly negligent manner as a lesser included offense of his count 8 charge of shooting at an inhabited occupied structure, or alternatively we should

---

[1]     Undesignated statutory references are to the Penal Code.

modify his sentence to run the two counts concurrently as they stemmed from the same act of shooting. Finally, pointing to his upper-term sentence on count 8, Rodgers contends we should remand his case to allow the trial court to apply amended section 1170, subdivision (b).

We agree the sentence must be vacated and the matter remanded for the court to resentence Rodgers consistent with amended section 1170, subdivision (b). We otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Because Rodgers does not challenge the sufficiency of the evidence of his convictions or firearm enhancements, we briefly summarize the underlying facts. We set out facts more fully later as necessary to address Rodgers's claims and prejudice arguments. The convictions stem from Rodgers's acts of firing shots from different guns into various homes, cars and other areas of San Diego neighborhoods over the course of several days in July 2019.

*Counts 5 through 8*

On the evening of July 18, 2019, J.Q. was sitting with family members in an outside patio area of his home on Estrella Avenue near El Cajon Boulevard when he heard six rapidly-fired gunshots. He felt bullets fly past him, and heard one shot strike something metal on his house. J.Q. did not see the shooter. One shot struck the rear window of a nearby car in the same block.

S.S. and his wife were walking in the 4400 block of Estrella Avenue by a tire shop when S.S. saw Rodgers on his knees shooting a gun about six or seven times towards El Cajon Boulevard. Rodgers, who was wearing a white

3

motorcycle helmet and a leather riding outfit, was with another man also wearing leather clothing. The men were caught on surveillance video, and at trial, S.S. identified the distinctive helmet Rodgers was holding when he was detained by police officers after another shooting days later.[2]

Officers later recovered shell casings from the area. An expert determined a recovered bullet was from a nine-millimeter caliber firearm.

*Count 12*

The next morning, a man at his Reynard Street home heard five gunshots. One bullet went through his living room window and lodged about seven feet from where he was seated; another went into the stucco of a nearby wall.

*Count 13*

About an hour later, Rodgers shot at and struck the vehicle of a woman driving on Polk Avenue and Alabama Street in the North Park area of San Diego. The woman's vehicle had a bullet hole in its front right tire and another in its rear left passenger door.

*Counts 10-11*

About 30 minutes after the North Park vehicle shooting, a man at his 33rd Street apartment hearing a commotion looked outside and saw Rodgers, wearing all black leather clothing and the same white motorcycle helmet, hiding behind a van and looking around as if to see if he was being watched. The man called police after he saw Rodgers haphazardly fire two shots down the alley then scale the gate of a nearby apartment.

---

[2]    A few hours later, officers responded to a report of four or five shots fired in downtown San Diego by two men on a Harley-Davidson motorcycle, one of whom had a white motorcycle helmet with a blue stripe. Officers canvasing the area did not find any shell casings or bullets, nor did they find surveillance cameras that may have captured the incident. The shooting was the basis for count 9, on which the jury acquitted Rodgers.

Ballistics testing revealed that all shots fired by Rodgers that morning were from the same gun, a .38-caliber special or .380-caliber Magnum revolver.

*Counts 1-4*

During the evening of July 24, 2019, a man was in his Amherst Street home when he heard a gunshot. He immediately ran outside and saw Rodgers, wearing gloves and holding the white motorcycle helmet, running down an adjacent alleyway then cutting through a church parking lot. Another man in the neighborhood heard the gunshot and within a couple of minutes saw Rodgers appear from the church property area cradling the helmet. Rodgers was intermittently walking and sprinting and looking behind him.

Officers responded to a report of shots fired, and one of the officers at the scene was given a description of an adult male wearing a grey long-sleeved shirt and black pants carrying a motorcycle helmet. The officer drove around the area and a few blocks away discovered Rodgers matching the description. As soon as Rodgers made eye contact with the officers, he began running away. Eventually the officers caught up with and apprehended Rodgers, who was wearing a fanny pack containing four expended shell casings that smelled like burnt gun powder. The fanny pack also smelled like discharged gunpowder. Rodgers had a bindle of methamphetamine in his shirt pocket. He showed signs of being under the influence of methamphetamine.

Police recovered a .380-caliber semiautomatic firearm on the side of a retaining wall in the area where Rodgers had been running down the alley by the other side of the wall. The gun smelled of burnt gunpowder.(5 RT 1026)!

The unexpended cartridges in the firearm matched the expended cartridges found in Rodgers's fanny pack, and an expert determined those expended cartridges had been fired from that weapon. A criminalist determined the gun had DNA from Rodgers and another man on it, with Rodgers being the 95 percent contributor.

At trial, during which Rodgers represented himself, the parties stipulated that Rodgers was previously convicted of felony assault with a deadly weapon.

*Defense Evidence*

Rodgers's mother testified that on July 18 and July 19, 2019, Rodgers was working as her caregiver; he stayed overnight on the 18th and did not leave the house on the 19th.

Rodgers testified in his defense. He claimed the motorcycle helmet he was found carrying on July 24, 2019, did not belong to him, but that he had borrowed it. He testified that on that day, he was near 7000 Amherst Street when he was surrounded by a crowd of six or seven people and robbed at gunpoint. After the gunman discharged his gun in the air, Rodgers sprayed the individuals with pepper spray, disbursing them. According to Rodgers, the gunman left behind shell casings, which Rodgers picked up. He eventually tried to flag down police officers but ran off to see where the robbery suspect went. Rodgers later filed an online police report of the matter.

*Rebuttal*

Following Rodgers's July 24, 2019 arrest, a detective interviewed him for almost an hour about the shootings of that day as well as the other

shootings that had occurred a week earlier. During that interview, Rodgers never told the detective that he had flagged down police officers because he was chasing a robber.

## DISCUSSION

I. *Admission of Rodgers's Prior Conviction/Alleged Prosecutorial Misconduct*

Rodgers contends the trial court prejudicially erred by allowing the prosecutor to introduce evidence that he was previously convicted of being a felon in possession of a firearm. He points out that during pretrial motions, the court had excluded the evidence, but during trial, the prosecutor improperly asked questions of him so as to open the door and allow its admission. He maintains the evidence was more prejudicial than probative, and its admission violated his Fifth and Fourteenth Amendment federal constitutional due process rights, warranting reversal of his convictions on counts 5 through 8 and 10 through 13.

A. *Background*

During pretrial motions, the court ruled it would permit the People to impeach Rodgers with his prior felony conviction for assault with a deadly weapon, but not his 2012 conviction for being a felon in possession of a firearm. The parties proceeded to discuss the People's motion to present a witness, T.W., who would have testified she saw Rodgers firing a nine-millimeter firearm into a canyon. Finding the incident too dissimilar, the court excluded the evidence without prejudice. The court then explained to

Rodgers how he might nevertheless "open the door" to admitting T.W.'s testimony:

"The court: ... [¶] ... Mr. Rodgers, if you get up and testify like you claim you're testifying, and you say certain things that might open the door

7

to this, for instance, you—you might say, 'I never shot a gun in my life'—I don't know what you're going to say—that may very well open the door to [the prosecutor] calling [T.W.] in and saying, 'Did you ever see him shoot a gun?' [¶] 'Yeah. We were down in Murphy Canyon. I saw him shooting a nine-millimeter into the canyon.' So that's how a trial goes. It's kind of a chess match."[3] The court asked the prosecutor to alert it in a sidebar if he felt Rodgers opened the door. It acknowledged the prosecutor might want to "bait" Rodgers into doing that, but cautioned to "steer [his] cross-examination away from [T.W.]"

During Rodgers's cross-examination, the prosecutor asked Rodgers about being seen running from the July 24, 2019 shooting. In response to the prosecutor's questions and presentation of photographs, Rodgers identified the helmet he was carrying as well as his gloves, fanny pack, and

methamphetamine found in his front pocket. The following exchange then occurred:

"[Prosecutor:] This was your gun?

"[Rodgers:] That was the gun I was robbed with. I don't own a gun.

"[Prosecutor:] You've never owned guns?

---

[3] The court repeated itself when Rodgers expressed confusion about what a sidebar was. It explained the purpose of pretrial evidentiary motions were to "set the table for this trial" and reminded Rodgers it had told the prosecutor he could not call T.W. to the stand and ask about that day. The court continued: "But you get on the stand and you say something like I just said, 'I've never fired a gun in my life,' now you're opening the door to him to say, "Hold on. Now I want to call [T.W.] back, Judge.' And say, 'Did you ever hear—see Mr. Rodgers? He says he never fired a gun. Did you ever see him fire a gun?' [¶] 'Yeah. Over there near Walmart.' [¶] . . . Right now he may not use that information. But if you open the door to it, we'll have that conversation. Understand?"

"[Rodgers:]  No.  I'm not in the military or anything.

"[Prosecutor:]  Have you ever possessed guns?

"[Rodgers:]  I object to violating court order.

"The court:  It's not a violation.  You must answer the question."

After the prosecutor had the reporter re-read the question, Rodgers answered:  "I have no recollection, at this point."  The exchange continued:

"[Prosecutor:]  You have no recollection?  [¶]  Are you denying the fact that you've possessed guns before?

"The court:  Answer the question.

"[Rodgers:]  In the motion in limine, you said that—

"The court:  I—

"[Rodgers:]  What's it called—

"The court:  —told you if you opened the door to the question, you could be answering them.  You just opened the door.  Answer the questions."

Rodgers objected that the evidence was inadmissible and irrelevant, which the court overruled.  The court directed Rodgers to answer, and Rodgers responded he had no recollection.  The court then invited the prosecutor to impeach Rodgers directly:

"[Prosecutor:]  Mr. Rodgers, isn't it true that you have, in fact, been convicted in the past of possessing firearms?


"[Rodgers:]  You have a piece of paper where I can look to refresh—

"The court:  The question is: 'Have you ever been.'  I'm sure he has a piece of paper.  Stop stalling.  Were you—answer the question.  Have you been convicted in the past of possession of weapons?  Yes or no.

"[Rodgers:]  Yeah.  And I said I stand by my previous testimony.

"[Prosecutor:] So you've been convicted in the past of possessing firearms?

"[Rodgers:] I stand by my previous testimony.

"The court: You have not testified yet. You have not answered the question. And I'm telling you to answer it or I'll answer it for you."

When Rodgers continued to refuse to answer, the prosecutor at the court's direction repeated the question:

"[Prosecutor:] Have you been convicted of possession of firearms?

"[Rodgers:] And I stand by what I testified what I said before.

"The court: What's your answer? Stop.

"[Rodgers:] I'm not playing.

"The court: Ladies and gentlemen, I will instruct you that on July 3, 2012, in San Diego Superior Court, Case [No.] CD240971, Mr. Rodgers was convicted of a violation of Penal Code section 29800[, subdivision] (a)(1), felon in possession of a firearm. That's undisputed evidence. You must accept it as true."

B. *Rodgers's Claim of Prosecutorial Misconduct*

We first address Rodgers's claim that the prosecutor engaged in prejudicial misconduct when he elicited inadmissible evidence, that is, asked

10

questions designed to elicit testimony that would open the door to admitting evidence of Rodgers's prior felon-in-possession-of-a-firearm conviction.[4]

A prosecutor may engage in misconduct by intentionally eliciting inadmissible testimony or evidence. (*People v. Molano* (2019) 7 Cal.5th 620, 675.) But such a claim requires proof that the prosecutor acted deliberately or intentionally; there is no misconduct where the prosecutor could not have anticipated a witness's testimony. (*Ibid.*; see *People v. Valdez* (2004) 32 Cal.4th 73, 125.)

Here, the prosecutor did not directly ask Rodgers whether he had been convicted of being a felon in possession of a firearm; the questions were directed at whether the gun found after the July 24, 2019 shootings belonged to Rodgers. Rodgers answered the question by claiming the gun belonged to the person that robbed him, then volunteered, "I don't own a gun." It was permissible for the prosecutor to follow up by asking Rodgers whether he had

---

[4] The People maintain Rodgers forfeited the contention by failing to specifically object that the prosecutor should have asked the court's permission before embarking on his questioning. " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Silveria* (2020) 10 Cal.5th 195, 306; see also *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853.) Here, however, after the prosecutor asked whether he had ever possessed a firearm, Rodgers promptly objected that the question violated the court's order. The court immediately overruled the objection, rendering futile a request for admonition on misconduct grounds. (See *Daveggio*, at p. 853 [absence of request for curative admonition may be excused if court immediately overrules an objection to misconduct]; see also *People v. Brooks* (2017) 3 Cal.5th 1, 93 [failure to object is excused if objection would be futile].) Though it is a close call, Rodgers's objection was timely and sufficiently particular to avoid forfeiture.

ever owned or possessed guns, as Rodgers's testimony tended to suggest he was unfamiliar with firearms because he had never owned them. Nor can we say the prosecutor's question violated the court's in limine ruling or its admonition to avoid "bait[ing]" Rodgers to open the door to impeachment evidence. The court's admonition pertained to T.W.'s proffered testimony, not to the evidence in general or the excluded firearm possession conviction.

Even if we were to assume the prosecutor somehow committed misconduct in his attempt to elicit Rodgers's testimony on whether he had ever possessed a firearm, we would not be persuaded to reverse. "Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." ' " (*People v. Davis* (2009) 46 Cal.4th 539, 612; see also *People v. Hoyt* (2020) 8 Cal.5th 892, 942-943.) We conclude below that the admission of Rodgers's 2012 felon-in-possession-of-a-firearm conviction did not prejudice him. For the reasons discussed below, neither prejudice standard in the misconduct context dictates reversal here.

C. *Legal Principles for Admitting Impeachment Evidence and Standard of Review*

"Generally speaking, evidence 'that has any tendency in reason to prove or disprove the truthfulness of a [witness's] testimony' is admissible." (*People v. Turner* (2017) 13 Cal.App.5th 397, 408; Evid. Code, § 780 ["the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his [or

her] testimony at the hearing"].)  Evidence of a prior felony conviction may be used for purposes of impeachment in any criminal proceeding.  (Cal. Const., art. I, § 28, subd. (f); see also Evid. Code, § 788 ["For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony"]; see *People v. Parker* (2022) 13 Cal.5th 1, 55.)  Additionally, "[e]vidence of circumstances underlying a conviction is admissible to impeach credibility if the proponent demonstrates that the evidence has 'any tendency in reason' to disprove credibility."  (*People v. Dalton* (2019) 7 Cal.5th 166, 214, citing Evid. Code, § 210 [defining relevant evidence as "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" including "evidence relevant to the credibility of a witness"]; see also *Turner,* at p. 408 [witness may be impeached by prior misconduct under Evidence Code section 780, subdivision (i)—applying to evidence that tends to establish " [t]he existence or nonexistence of any fact testified to by [the witness]' "—by suggesting part of the witness's testimony is untrue].)  "Trial courts retain discretion to exclude such evidence under Evidence Code section 352 'if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time or . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' "  (*Dalton*, at p. 214; *Turner*, at p. 408 ["The trial court has broad discretion in determining whether to admit impeachment evidence, including whether it is subject to exclusion under [Evidence Code] section 352"].)  "In exercising its discretion under Evidence Code section 352, the court must consider [(1)] whether the prior conviction reflects adversely on the witness's honesty or veracity, [(2)] its nearness or remoteness in time, [(3)] its similarity to the present offense, and [(4)] the

potential effect on the defendant's failure to testify." (*People v. Carkhum-Murphy* (2019) 41 Cal.App.5th 289, 295; see also *Parker*, at pp. 55-56; *People v. Edwards* (2013) 57 Cal.4th 658, 711; *People v. Clark* (2011) 52 Cal.4th 856, 931.) "Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt." (*People v. Crew* (2003) 31 Cal.4th 822, 842.)

Thus, on appeal, a trial court's admission of prior misconduct evidence, like all admissibility determinations, is reviewed with deference. The abuse of discretion standard requires us to view the record in the light most favorable to the court's ruling. (See *People v. Edwards*, *supra*, 57 Cal.4th at p. 711.) Because a court's discretion in admitting or excluding evidence is broad, " 'a reviewing court ordinarily will uphold the trial court's exercise of discretion.' " (*People v. Anderson* (2018) 5 Cal.5th 372, 407.) And, even if error is found, only prejudicial error warrants reversal. In the event of error, a miscarriage of justice requiring reversal "should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

D. *Analysis*

Reviewing the record in the light most favorable to the court's ruling (*People v. Edwards*, *supra*, 57 Cal.4th at p. 711), we conclude the court did not abuse its broad discretion by admitting evidence of Rodgers's prior conviction for being a felon in possession of a firearm in view of Rodgers's answers to the prosecutor's questions about owning guns. Though the court did not express its reasoning for concluding Rodgers's answers opened the

14

door to the evidence, it could have reasonably concluded that Rodgers's statement that he had never owned firearms tended to suggest to the jury that he was unfamiliar with them, thereby permitting questioning on whether he had ever possessed a firearm.  Because the court should not permit a defendant to testify with a " ' "false aura of veracity" ' " (*People v. Hinton* (2006) 37 Cal.4th 839, 888), when Rodgers refused to answer the question, it reasonably admitted evidence of his prior conviction on the issue of Rodgers's credibility.  This was particularly true where Rodgers's "line of defense at trial was an outright denial of guilt, i.e., his credibility was directly at issue."  (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925.)

Further, Rodgers's 2012 conviction was not overly remote, and it is a crime of moral turpitude.  (*People v. Robinson* (2011) 199 Cal.App.4th 707, 714-715; *People v. Littrel* (1986) 185 Cal.App.3d 699, 702-703; see also *People v. Aguilar* (2016) 245 Cal.App.4th 1010, 1018-1019 [acknowledging *Robinson* and *Littrel*].)  The California Supreme Court has limited the admissibility of prior convictions to those which necessarily involve moral turpitude.  (*People v. Hinton, supra*, 37 Cal.4th at pp. 887-888.)  Finally, the court's decision to admit the prior for impeachment purposes had no adverse impact on Rodgers's right to testify "because [he] actually took the stand and suffered impeachment with the prior[ ]."  (*People v. Mendoza, supra,* 78 Cal.App.4th at p. 926.)

E.  *Rodgers Did Not Suffer Prejudice by Admission of His Felon in Possession Conviction*

We need not further examine the propriety of admitting Rodgers's prior conviction, as we hold Rodgers has not established its admission prejudiced him.  By taking the stand and offering an alibi defense denying guilt for the offenses, Rodgers put his credibility squarely at issue, and as a result,

15

exposed himself to being impeached with his conviction for being a felon in possession of a firearm. As a conviction involving moral turpitude, it was admissible under Evidence Code section 788 as long as it was not otherwise excludable under Evidence Code section 352.

We see no basis to conclude the evidence was so prejudicial as to constitute a miscarriage of justice. When the jury rendered its verdict in this case it already had before it Rodgers's admission that he was a convicted felon for assault with a deadly weapon. It knew that he possessed a weapon in connection with counts 1 through 4, the July 24, 2019 offenses, as Rodgers's DNA was on the gun found at the scene and determined to have been used in those shootings.

The direct and circumstantial evidence against Rodgers on counts 5 through 8 and 10 through 13 was relatively strong. Witnesses identified Rodgers by his distinctive helmet in connection with the shootings of counts 5 through 8, and another witness identified Rodgers by his helmet in one of the July 19 shootings (counts 10 and 11). Rodgers's defense depended largely on the jury crediting his uncorroborated testimony concerning his claim of being the victim of a robbery on July 24, 2019. But his testimony was undermined by the fact he never reported to the interviewing detective that he was robbed that day.

Further, the prosecutor only briefly referenced the prior 2012 felony during closing arguments without identifying the nature of the conviction, then turned to Rodgers's other felony assault conviction, the admission of which Rodgers does not challenge. The prosecutor said: "Possession of a firearm by a felon. [Rodgers] possessed a firearm. He knew he possessed the firearm. He was previously convicted of a felony. This just pertains to all

16

these counts that he's shooting. Every single day he's been charged with possessing a firearm because he was shooting on those days. Right. He has to know he has a firearm. Obviously, if he's using it, he knows it. [¶] And that he's been convicted of a felony. You know that. He was convicted. And you'll have the ability to look at it, assault with a deadly weapon."

Finally, the jury acquitted Rodgers of count 9, demonstrating that it did not view Rodgers's prior felony conviction as tending to show a bad character, or that it gave undue weight to the court's admonitions to Rodgers. Rodgers maintains this shows the jury did not find the evidence of guilt to be overwhelming, but the jury's not guilty finding on that count is not an indication of the jury's belief in the strength of the evidence on Rodgers's other charges as to which they found him guilty. He also maintains the court exacerbated prejudice to him by "repeatedly berating" him in front of the jury, making it probable the jury did not think highly of him or his credibility. We cannot agree that the court's instruction to Rodgers to "stop stalling" and to answer the questions shed an unduly negative light on him.

In the *Watson* prejudice scenario in which we consider a hypothetical trial in which the jury was not instructed that Rodgers had suffered a prior 2012 felon in possession conviction, we see no reasonable probability the outcome would have been different. On this record, there is not enough to conclude Rodgers suffered a miscarriage of justice warranting reversal under *Watson, supra*, 46 Cal.2d 818.

Rodgers claims the error violated his federal Fifth and Fourteenth Amendment constitutional rights to due process and is reversable under the more exacting harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). He relies on a federal Fifth Circuit Court of Appeal case that does not bind us (*People v. Williams* (2013) 56

17

Cal.4th 630, 668) and *People v. Garceau* (1993) 6 Cal.4th 140, disapproved on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)  We are not persuaded.  *Garceau* involved evidence of uncharged offenses admitted pursuant to a jury instruction allowing the jury to consider the evidence " 'for any purpose, including but not limited to' " the defendant's " 'character or any trait of his character.' "  (*Id*. at p. 186, italics omitted.)  The court acknowledged the "potentially devastating impact" of such evidence, but held its admission was harmless beyond a reasonable doubt given the trial evidence.  (*Id* at p. 187.)  The court's ruling in this case bears no resemblance to the court's error in *Garceau*.  Rodgers's argument does not compel us to assess prejudice under the federal *Chapman* standard.

## II.  *Count 5 and 8 Convictions*

In sentencing Rodgers on counts 5 and 8 for the shooting on Estrella Avenue, the court first heard arguments from counsel on the application of section 654.  It then stated:  "Count No. 5, although it occurred on the date, it was a different incident [than count 8].  Count 8 was the discharge at the home where the family was sitting on their porch.  Count No. 5 was when Mr. Rodgers fired his gun across El Cajon Boulevard for no good reason.  That's a separate incident.  I'm going to impose one-third the midterm of Count No. 5.  That's eight months to be served consecutively."

Pointing out the count 5 offense for discharging a firearm in a grossly negligent manner is a lesser included offense to his count 8 conviction for shooting at an inhabited occupied structure, Rodgers contends this court must reverse the count 5 conviction and vacate the 8-month consecutive sentence on this count.  According to Rodgers, count 5 was based on the same

18

act of shooting at the exact same time in the same area of Estrella Avenue. He maintains he committed the shootings "in rapid succession, without a break in the action" and there was no time for reflection, making multiple convictions improper. Rodgers alternatively contends that we should modify his sentence to impose a two-year concurrent midterm on count 5, because the court mistakenly believed the shooting observed by S.S. was separate from the shooting fired toward J.Q.'s home patio. He concludes that this court should at least remand and instruct the trial court that the convictions for counts 8 and 5 are not based upon two separate shootings, to allow the court to decide whether to impose concurrent or consecutive sentences based on accurate information.

A. *Legal Principles*

"[I]t is generally permissible to *convict* a defendant of multiple charges arising from a single act or course of conduct. [Citations.] However, a 'judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses. [Citations.]' [Citation.] [¶] When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed. [Citations.] If neither offense is necessarily included in the other, the defendant may be convicted of both, 'even though under section 654 he or she could not be punished for more than one offense arising from the single act or indivisible course of conduct.' " (*People v. Sanders* (2012) 55 Cal.4th 731, 736; see also *People v. White* (2017) 2 Cal.5th 349, 353-354.) Section 954 is the statute that generally permits

multiple convictions; section 654 is its counterpart prohibiting punishment for the same act or omission. (*People v. Sloan* (2007) 42 Cal.4th 110, 116; see also *People v. Johnson* (2007) 150 Cal.App.4th 1467, 1474 [discussing "the tension" between the statutes in addressing battery of a cohabitant offenses].)

Section 954 has been held to permit a separate conviction for each *completed* crime as determined by the nature of the offense, even if the defendant had the same intent and objective in committing the multiple crimes and even if the defendant committed them at or about the same time. (See *People v. Johnson, supra,* 150 Cal.App.4th at pp. 1476-1477, applying the analysis in *People v. Washington* (1996) 50 Cal.App.4th 568, 577-579 to "successive acts of violence" against the victim].) *Johnson* involved whether defendant could be properly charged and convicted of multiple counts of spousal abuse under section 273.5 based on acts occurring during a single event; the court held such multiple convictions were proper if the victim suffered multiple injuries caused by distinct applications of force. Looking to the statute, the court reasoned the "crime described by section 273.5 is complete upon the willful and direct application of physical force upon the victim, resulting in a wound or injury. It follows that where multiple applications of physical force result in separate injuries, the perpetrator has completed multiple violations of section 273.5." (*Id.* at p. 1477.) Thus,

*Johnson* upheld three separate convictions of section 273.5, each of which concerned separate injuries sustained during the same beating. (*Ibid.*)[5]

B. *Analysis*

The People correctly concede that shooting in a grossly negligent manner under section 246.3 is a lesser included offense of shooting at an occupied dwelling house under section 246. (See *People v. Ramirez* (2009) 45 Cal.4th 980, 983, 990 [§ 246.3 is a necessarily included lesser offense of § 246]; see *People v. Sloan¸ supra*, 42 Cal.4th at p. 115, fn. 2 [courts interchangeably use terms "necessarily included" and "lesser included" offenses].)[6] They maintain we must reject Rodgers's contentions, however, because his convictions were based on two separate acts that were committed with separate intents and objectives, and given the court's implicit ruling

---

[5] "Defendant indisputably committed successive acts of violence against Doe [during the same beating incident]. Although Doe's testimony does not precisely describe the sequence of the beating, we do know that defendant beat her about the face and head; held her by her throat up against the wall; beat her on her back, hips, and legs; and stabbed her in the upper arm. Doe suffered two black eyes, a split lip, bruises to her neck, back, and hips and a puncture wound to her upper arm. From this evidence the jury could have concluded that defendant completed one violation of section 273.5 when he beat Doe about the head and face, blackening her eyes and splitting her lip; another when he held her by the throat and continued to strike her and restrain her such that she suffered bruises about her back and neck; and another when he injured her upper arm, drawing blood and leaving a visible scar. Accordingly, the evidence is sufficient to support the three convictions of section 273.5." (*People v. Johnson, supra,* 150 Cal.App.4th at p. 1477.)

[6] Indeed, as to the charges of shooting at an occupied home (counts 8, 12 and 13) the court instructed the jury that discharging a firearm was a lesser included offense, and that it could not convict Rodgers of both the lesser and greater offenses for the same conduct.

that they were not part of a continuous course of conduct, there is no bar to multiple conviction or punishment.[7]

We agree Rodgers was properly convicted of both counts. During closing arguments, the prosecutor distinguished between Rodgers's reckless shootings down alleyways or toward vehicles, and his shots fired at inhabited dwellings: "The law says it is not required that the defendant intend to shoot at a house or vehicle when he fired. In other words, when he got the gun, and he went like this, he says, 'I'm going to shoot [one victim's] car.' Not required. *He shot in the area where cars were. He shot at a neighborhood. He shot*

---

[7] For this proposition, the People tell us *People v. Ramirez*, *supra*, 45 Cal.4th 980 is instructive. But *Ramirez* only decided the issue of whether all of the elements of the section 246.3 offense were necessarily included in the "more stringent" requirements of section 246. (*Id*. at p. 990.) And the parties in *Ramirez* agreed that three of the grossly negligent shooting counts and three counts of shooting at an inhabited dwelling were based on the same acts. (*Id*. at p. 984.) The People assert the *Ramirez* court did not question whether the defendant in that case could be separately convicted on the other shots fired. But we decline to draw conclusions from the court's silence on that point. (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 332 [cases do not stand for propositions not considered by the reviewing court].) The People also say the California Supreme Court is considering the parameters of prohibiting convictions for lesser included offenses arising out of the same conduct. The cited case, *People v. Aguayo* (2022) 13 Cal.5th 974, decided after the People filed their brief, involved dual assault convictions on offenses that the court determined were "different statements of the same offense," not offenses that were greater and lesser offenses of each other. (*Id*. at p. 979.) *Aguayo* held the People could not overcome the problem created by the defendant's dual convictions of the assault offenses by demonstrating they were based on separate acts, because the jury did not make findings identifying which act supported each count, the People did little to differentiate the offenses, and the prosecution and defense counsel viewed the offenses as based on the same act or course of conduct. (*Id*. at pp. 993-994.) It found a reasonable probability the jury would have convicted the defendant of only one, not both, offenses. (*Id*. at p. 995.)

*across El Cajon* [*Boulevard*]. He did all those things intentionally."[8] (Italics added; compare, *People v. Aguayo*, *supra*, 13 Cal.5th at p. 994 [claim of separate acts rejected where prosecution did not identify the particular act supporting each offense and "did little to differentiate between the two counts"].) After being properly instructed about counts 5 and 8 being lesser included and greater offenses (see footnote 6, *ante*), the jury convicted Rodgers of both count 5 and count 8. It implicitly found, therefore, that the offenses were not based on the same conduct or act.

The question becomes whether substantial evidence supports the implied finding, and we conclude it does. " 'To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt.' [Citation.] 'This standard of review applies when the evidence is largely circumstantial . . . .' " (*People v. Hardy* (2018) 5 Cal.5th 56, 89.)

It is true that the evidence reflects that J.Q. and S.S. both heard the shootings in the area of Estrella Avenue and El Cajon Boulevard at about 8:40 p.m. on July 18, 2019. Though it can be said counts 5 and 8 were part of one shooting incident as there was evidence that Rodgers fired shots in rapid succession, the evidence also shows he fired the multiple shots at multiple targets, including J.Q.'s house, surrounding trees, and a nearby vehicle. Each shot required a separate pull of the trigger, permitting the jury to find

---

8    The prosecutor also specifically referenced count 5 (and the other negligent discharge counts) when he said: "[Rodgers] intentionally shot a firearm. He did the shooting in gross negligence. Gross negligence means that he acted in a reckless way that creates a high risk of death or great bodily injury. *He shot down alleyways. He shot down towards busy intersections*." (Italics added.)

23

his negligent discharge of a firearm was committed when shooting down the alley and hitting different targets than J.Q.'s home, which gave rise to a separate completed offense of shooting at an inhabited dwelling house. (Accord, *People v. Johnson, supra*, 150 Cal.App.4th at p. 1477.)  Cases decided in the context of section 654 explain that multiple shootings during a course of criminal conduct may give rise to a finding that the conduct is " ' "divisible and therefore gives rise to more than one act" ' " if they had a separate intent and objective, and posed a separate risk to the victims or their property. (*People v. Phung* (2018) 25 Cal.App.5th 741, 759-761; *People v. Trotter* (1992) 7 Cal.App.4th 363, 368.)  That is the case here.  Rodgers " 'should . . . not be rewarded where, instead of taking advantage of an opportunity to walk away . . . , he voluntarily resumed his . . . assaultive behavior.' " (*Trotter*, at p. 368.)

Our conclusion does not change in view of Rodgers's arguments that his shootings were part of an indivisible course of conduct without time for reflection.  It was reasonable for the jury to find that when he pulled the trigger on his firearm, Rodgers had time for reflection between each shot. "Whether a reasonable trier of fact could reach a different conclusion based upon the same facts does not mean the verdict[s are] not supported by sufficient evidence." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 490.)

We reject Rodgers's alterative contention that he should be resentenced on counts 5 and 8 because they arose from the same set of operative facts.[9] "[W]here multiple acts evincing the same intent are sufficiently independent

---

9    At the time of sentencing, section 654 provided:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision . . . . " (Former § 654, subd. (a).)

24

to reflect a renewal of such intent, section 654 is no bar to separate punishments." (*People v. Mendoza* (2022) 74 Cal.App.5th 843, 854; see also *People v. Trotter, supra*, 7 Cal.App.4th at p. 368.) The evidence that Rodgers pulled the trigger multiple times and hit multiple different targets during the Estrella Avenue shooting permits us to conclude he had a separate intent in firing each shot. For firing multiple gunshots affecting multiple victims and property, Rodgers was subject to separate punishment on count 5 for discharging a firearm in a grossly negligent manner and count 8 for firing at an inhabited dwelling house. (*People v. Phung, supra*, 25 Cal.App.5th at p. 761.)

III. *Application of Amended Section 1170, Subdivision (b)*

In sentencing Rodgers, the trial court followed the probation officer's recommendation and imposed a 7-year upper term on count 8, which was the principal term. In doing so, the court found numerous aggravating factors. Specifically, it found Rodgers's crimes involved "great violence, great bodily harm, threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness or callousness" as he "was convicted of discharging a firearm on six separate occasions for, frankly, no good reason at all." It found Rodgers was armed with or used a firearm, the victims were particularly vulnerable, and Rodgers induced another person to participate in the crimes' commission. The court found Rodgers's implausible story about being a robbery victim interfered with the judicial process. It found Rodgers was convicted of other crimes for which consecutive sentences could have been imposed; his crimes involved some element of planning or sophistication; he

engaged in violent conduct indicating a serious danger to society, and his convictions from his juvenile true findings to his adult convictions were of

increasing seriousness. It found he served a prior prison term, and he exhibited unsatisfactory performance on probation. The court considered mitigating factors, but found none applicable or true.[10]

Rodgers contends we must remand his case for resentencing to permit the trial court to retroactively apply section 1170, subdivision (b), amended effective January 1, 2022, to change the court's authority to impose an upper term sentence. Specifically, the amended law provides that the trial court must impose the middle term unless certain circumstances exist. (See Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (2); *People v. Lopez* (2022) 78 Cal.App.5th 459, 464 (*Lopez*).) The court may impose an upper-term sentence only where there are circumstances in aggravation, and the facts underlying all of the aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by a jury or a judge in a bench trial. (§ 1170, subd. (b)(1), (2); *Lopez*, at p. 464.) Notwithstanding these provisions, a court, "may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).) The court must "set forth on the record the facts and reasons for choosing the sentence imposed" and it "may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (§ 1170, subd. (b)(5).)

The People properly concede that the law applies retroactively to Rodgers, whose judgment was not final on its effective date. (See *In re Estrada* (1965) 63 Cal.2d 740, 745-746; *Lopez, supra*, 78 Cal.App.5th at p. 465; *People v. Flores* (2022) 75 Cal.App.5th 495, 520 (*Flores*).) However, they

---

10    The court found the aggravating factors "clearly outweigh[ed]" the mitigating factors, though it acknowledged there were no mitigating factors.

26

maintain any error in Rodgers's sentencing is harmless because the court relied on his prior criminal record, and "the jury would surely have found the remaining factors relied upon by the court to be true beyond a reasonable doubt." They rely on *Flores* for the proper harmless error test, but acknowledge this court in *Lopez* disagreed with that analysis. According to the People, this case differs from *Lopez* in that many of Rodgers's sentencing factors were "beyond dispute" and the People are not relying on one factor out of a long list of aggravating factors to urge remand is unnecessary. They say there is "every reason to believe" the court would have imposed the same sentence based on proper factors which they consider to be the seriousness of Rodgers's crimes, his use of a weapon, his interference with the judicial process by filing a false police report, and his recidivism.

In *Lopez, supra*, 78 Cal.App.5th 459, this court held that where a sentencing factor must be found true by a jury beyond a reasonable doubt and the court fails to submit that factor to the jury, the court's reliance on that fact may be subject to harmless error review. (*Id*. at p. 465.) However, we explained that in order to find the court's reliance on improper factors was not prejudicial, "we would have to conclude beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt *every factor on which the court relied*, because the amended statute requires that every factor on which a court intends to rely in imposing an upper term, with the exception of factors related to a defendant's prior conviction(s), have been admitted by the defendant or proven to a jury." (*Id*. at pp. 465-466.)

This court further held that if all aggravating factors relied on by the court did not survive this first level of analysis, a second step of analysis was required. At this second step, we consider "whether it is reasonably probable

27

that a more favorable sentence would have . . . been imposed absent the trial court's improper reliance on such factors." (*Lopez, supra*, 78 Cal.App.4th at p. 467.) We summarized the analysis in this way: "[T]he initial relevant question for purposes of determining whether prejudice resulted from failure to apply [amended section 1170] is whether the reviewing court can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied in exercising its discretion to select the upper term. If the answer to this question is 'yes,' then the defendant has not suffered prejudice from the court's reliance on factors not found true by a jury in selecting the upper term. However, if the answer to the question is 'no,' we then consider the second question, which is whether a reviewing court can be certain, to the degree required by [*Watson, supra,*]46 Cal.2d [at page] 836 . . . , that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied. If the answer to both of these questions is 'no,' then it is clear that remand to the trial court for resentencing is necessary." (*Lopez*, 78 Cal.App.5th at p. 467, fn. 11.) Other courts have articulated somewhat

28

different prejudice standards.  (See *People v. Ross* (2022) 86 Cal.App.5th 1346, 1354 [discussing cases decided after *Flores, supra,* 75 Cal.App.5th 495].)[11]

We conclude the court's failure to sentence Rodgers in keeping with amended section 1170 cannot be deemed harmless under *Lopez* or the other articulated standards.  Rodgers did not stipulate to the aggravating factors relied upon by the court, nor were they all found true by the jury.  We are unable to conclude to the degree of certainty required by the *Chapman* or *Watson* prejudice standards that the jury would have found true beyond a

_____

[11]    The California Supreme Court has granted review on the question. (See *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.)  In *People v. Dunn* (2022) 81 Cal.App.5th 394, review granted October 12, 2022, S275655, the court held that at the first step of the prejudice analysis, the appellate court must determine whether, to the level of certainty required by *Chapman, supra,* 386 U.S. 18*, one* of multiple aggravating factors would have been found true by the jury beyond a reasonable doubt and *also* whether under *Watson*, *supra*, 46 Cal.2d 818 there is a reasonable probability the jury would have found any remaining aggravating circumstance true beyond a reasonable doubt.  (*Dunn*, at pp. 408-409.)  If not all relied-upon aggravating circumstances would have been proved to those standards, the appellate court asks in a second step whether there is a reasonable probability the lower court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record.  (*Id.* at pp. 409-410.)  If the answer is yes, the appellate court must vacate the sentence and remand for resentencing consistent with section 1170, subdivision (b).  (*Id.* at p. 410.)  In *People v. Zabelle* (2022) 80 Cal.App.5th 1098, the court held the reviewing court first need only identify one aggravating factor that withstands *Chapman* harmless error analysis.  (*Zabelle*, at pp. 1111-1112.)  If the court identifies one such factor, it "for each [remaining] aggravating fact, consider[s] whether it is reasonably probable that the jury would have found the fact not true." (*Id.* at p. 1112.)  The reviewing court "must then, with the aggravating facts that survive this review, consider whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts." (*Ibid.*)

reasonable doubt *all* of the aggravating factors relied upon by the trial court. Some of the factors, whether the victims were "particularly" vulnerable, Rodgers's "callousness," his exhibition of "some element" of planning or sophistication and his asserted interference with the judicial process, require a subjective or "comparative evaluation of the facts," making it difficult to determine to any degree of certainty how a jury would evaluate them. (See *People v. Sandoval* (2007) 41 Cal.4th 825, 840 [victim vulnerability is the sort of standard that requires an "imprecise quantitative or comparative evaluation of the facts" and suggesting such circumstances are based on a "somewhat vague or subjective standard"]; *People v. Ross, supra*, 86 Cal.App.5th at p. 1355.) To the extent the trial evidence touched on those factors, we cannot say it was overwhelming. Thus, we reject the People's argument that "the jury would surely have found the remaining factors relied upon by the court [apart from Rodgers's criminal record or prior convictions] to be true beyond a reasonable doubt."

Moreover, we reject the People's argument that Rodgers had "every reason" at trial to prove facts disputing some of the aggravating factors. The law had not changed by the time of trial to require sentencing factors be presented to the jury, giving Rodgers no incentive or reason to present such evidence. As in *Lopez*, "[i]t would be entirely speculative for us to presume, based on a record that does not directly address the aggravating factors, what a jury would have found true in connection with these factors." (*Lopez, supra*, 78 Cal.App.5th at p. 466.)

Since fewer than all aggravating facts survive the first level of harmless error analysis, we consider under *Watson* whether it is reasonably probable the trial court would have exercised its discretion to impose a lesser sentence on a subset of provable aggravating facts. (*Lopez, supra*, 78

30

Cal.App.5th at p. 467, fn. 11; *People v. Dunn, supra*, 81 Cal.App.5th at pp. 408-409; *People v. Zabelle, supra*, 80 Cal.App.5th at p. 1112; *People v. Ross, supra*, 86 Cal.App.5th at p. 1356.) The question is not whether the court could have relied alone on Rodgers's prior convictions in determining sentencing. In assessing prejudice, we do not ask "whether the trial court could have relied on the single aggravating factor of [Rodgers's] recidivism to impose the upper term sentence; unquestionably the trial court may still rely on any single permissible aggravating factor to select an upper term sentence under the newly-revised triad system. Rather, the second relevant prejudice question is whether we can be assured that the trial court *would have exercised its discretion to impose the upper term* based on a single permissible aggravating factor, or even two or three permissible aggravating factors, related to [Rodgers's] prior convictions, when the court originally relied on both permissible and impermissible factors in selecting the upper term." (*Lopez, supra*, 78 Cal.App.5th at p. 467.) Here, as in *Lopez*, the trial court relied on numerous aggravating factors in selecting the upper term on count 8. Thus, as in that case, "[t]he record does not clearly indicate that the trial court would have exercised its discretion to impose an upper term based on an aggravating factor relating to [Rodgers's] prior convictions . . . ." The court offered no indication it would have selected an upper term based on a single aggravating factor or on some subset of permissible factors. (*Id*. at p. 468.) We hold under these circumstances—particularly on the law's new presumption in favor of the middle term—there is at least a reasonable probability the court would have viewed the sentencing scenario differently and selected lesser terms as a result.

We thus vacate Rodgers's sentence and remand so that he can be resentenced under the current version of section 1170, subdivision (b) and the procedures set forth in *Lopez*.  (*Lopez, supra*, 78 Cal.App.5th at pp. 468-469.)

## DISPOSITION

Rodgers's sentence is vacated and the matter is remanded to the trial court for resentencing consistent with the amendments to section 1170. Following resentencing, the trial court must prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.